ELLA S. DORIS, ADMINISTRATRIX, (ESTATE OF EMMA STOKES PILLING) *vs.* DAVID W. McFARLAND ET ALS.

Third Judicial District, Bridgeport, April Term, 1931.

MALTBIE, C. J., HAINES, HINMAN, DICKENSON AND JOHN RUFUS BOOTH, JS.

Argued April 22d—decided July 29th, 1931.

*Raymond E. Hackett,* with whom was *John D. Walker,* for the appellant (plaintiff).

*William H. Comley,* with whom, on the brief, was *Harry R. Sherwood,* for the appellees (defendants).

HAINES, J. The plaintiff is a sister and the administratrix of the estate of Emma Stokes Pilling who died intestate on September 27th, 1923, and the defendants, husband and wife, own, maintain, and conduct an institution at Westport in this State, known as the Halle-Brook, for the custody, care and control of the insane, lunatics, feeble-minded, drug addicts, and so-called "nervous cases." Upon the application of the mother of the intestate and after hearing, the Court of Probate for the district of Westport, on September 15th, 1909, found the intestate to be insane and so adjudicated, and ordered that she be committed to the Halle-Brook and "confined while such insanity continued and until she shall be discharged in due course of law," and that the defendants take her into their care and custody. Theretofore, on September 8th, 1909, and after the application by her mother and after hearing the testimony of two physicians who had examined her, the Court of Probate had ordered that the defendant Dr. David W. McFarland, should have immediate charge of the person of the intestate and exercise the necessary care and restraint of her during the pendency of the application. Pursuant to the judgment of September 15th, the defendants removed the intestate to the Halle-Brook and so kept her in their care, custody and control. This judgment of the Court of Probate has never been specifically revoked or nullified by the court. By the same court, on November 13th, 1909, the intestate was adjudged incapable of managing her affairs and her mother Emma N. Stokes was appointed conservator and qualified and acted as such until June 21st, 1911, when she presented her resignation to the court and was discharged

from her trust, and no conservator was thereafter named for the intestate. She remained in the Halle-Brook under the probate commitment until the summer of 1910, and on July 29th, 1910, at the request of the plaintiff, she was permitted to leave the care and custody of the defendants and go with the plaintiff, her sister, to New York for the purpose of aiding the latter in attending to the affairs of their mother. She never returned to the care or custody of the Halle-Brook or the defendants, but was on January 1st, 1911, officially discharged therefrom, an entry being then made by Dr. McFarland, the official in charge, on the books of the institution, that she was, on that date, so discharged as recovered. For some years before and after this date the intestate was without substantial means of her own.

The first seven paragraphs of the complaint purport to recite the description of the parties, the adjudications of the court and the acts of the parties thereunder; the eighth, by way of resume, asserts that the intestate was "incompetent and legally incapable of making disposition of her property." Paragraphs nine to sixteen inclusive are a long and detailed statement of the claimed circumstances of building a house upon the land of Mrs. McFarland and the expenditure of her money therefor. The gist of these allegations is that, at every step in the proceedings, she was known by these defendants to be an incompetent, and was under their "domination, control and influence," "improper and fraudulent influence," "bidding and command" and that by such "improper acts, conspiracy and fraud" they succeeded in "unjustly enriching themselves and their real estate by the value of said dwelling house." The seventeenth and last paragraph of the complaint merely refers to certain liens on the property by third persons. The prayer for relief is

twofold: That the court decree that the defendants
have been unjustly enriched, and that they be declared
trustees of the premises for the benefit of the plaintiff
for the amount which their property has been en-
hanced in value by the house thereon, or that a re-
ceiver be appointed, the premises sold and the proceeds
first subjected to the plaintiff's demand for the en-
hanced value of the defendants' property.

The trial court upon the plaintiff's motion made a
considerable addition in the way of details to the orig-
inal findings. Those changes which were refused, and
in doing which the plaintiff contends there was error,
relate in part to the character of the mental disorder
from which the intestate suffered and its curability.
The trial court found that the intestate had been
treated at a sanitarium in New York State for the
morphine habit and had also been confined in the psy-
chopathic ward at Bellevue where she was under ob-
servation for five days before she was committed to
the Halle-Brook. At the time of her admission to
the latter institution, Dr. McFarland thought her case
to be "Drug habitue, with psychosis-Paranoiac." The
trial court further finds that she was insane in conse-
quence of prior addiction to the use of drugs and the
mental disturbance resulting from the withdrawal of
their use, and that "she was not permanently insane,
nor suffering from any form of mental disease; and
the mental disarrangement, due to the withdrawal of
the use of drugs, . . . was capable of treatment and
complete cure." The plaintiff seeks to strike out these
conclusions as to the character and cure of the in-
testate's mental disturbance as lacking support in the
evidence and asks that the diagnosis of Dr. McFarland
above quoted, be followed by a finding of fact that "an
insane person suffering from paranoia never recovers
and that that form of insanity is always regarded as

incurable," asserting that this is "an admitted and undisputed fact." In support of the requests for changes in the finding, the appellant had certain portions of the evidence certified as exhibits, but, upon motion of the defendants, the court certified all the evidence for our consideration. A painstaking reading of all the evidence shows ample support for the finding made by the court above quoted, and indeed the record is entirely bare of any evidence to the contrary. The testimony from all witnesses as to the actual mental condition of the intestate, is to the effect that she was of mental alertness and much more than ordinary intellectual capacity, during the time of the transactions which are the basis of this action. There is no evidence of any kind as to the cause of her commitment save the fact conclusively established by the evidence that she was then suffering from a previous addiction to drugs, and there is no denial by any witness of her complete recovery from those effects. We cannot strike out these paragraphs of the finding to which the plaintiff is now objecting. It is equally true that when the intestate first came to the Halle-Brook, Dr. McFarland thought her to be a "Drug habitue, with psychosis-Paranoiac." He also said in his testimony, what is not anywhere disputed, that paranoia is always regarded as incurable. It follows that the plaintiff was entitled to have this latter statement included in the finding, and we so treat it, though its relevancy is not apparent since it appears from the finding that she was not a paranoiac. In view, however, of the clear distinction made by the doctor between the terms "diagnosis" and "impression," we must assume that the use of the term "diagnosed" in the finding, was inadvertent and erroneous. The obvious meaning was that it was his first impression, since he so stated in his testimony, and added that a diagnosis could not

be made short of three to six months in such cases. We do not overlook the fact that the plaintiff sought a finding to the effect that the testimony of certain witnesses as to the mental soundness of the intestate, to which the plaintiff objected, was the basis of the court's conclusion that she was of sound mind. The court complied in part with this request, but added that its conclusion was based upon this evidence "together with all the evidence in the case."

Other additions desired are either in substance included in it or cannot be regarded as stating admitted or undisputed facts, and some are not important.

The plaintiff seeks to strike out ten paragraphs of the finding; one of these—paragraph ten—covers the cause, character and curability of the condition of the intestate, and has already been sufficiently noticed. The finding is supported by the evidence. All the remaining paragraphs are supported by evidence, mostly of a positive and direct character, which though obviously not accepted as true by the plaintiff, was believed by the court. A few of the statements are inferences, but a careful reading of the evidence fully satisfies us that these are reasonable and proper inferences from direct evidence which the court was privileged to believe to be true. We cannot strike out any of these paragraphs. With these comments and the slight changes we have made, the finding stands.

The history of the financial transactions of the intestate which are brought in question by this action, is shown by the finding to be briefly as follows: Nearly five years after discharge the intestate went to Dr. McFarland for treatment for a broken leg, and at that time she was in full possession of her faculties. The same year, 1915, her mother died and a controversy having arisen between the sisters over her estate, it was terminated by a written agreement—dated Octo-

ber 16th, 1915 (Exhibit B)—between them, providing for a division of the estate, and resulting in about $135,000 in cash and securities being turned over and delivered to the intestate. After her discharge from custody she frequently visited the defendants and after the settlement with her sister, she stayed with them from time to time at Westport. She had a great affection for them and reposed trust and confidence in them because of the kindness they had shown her when she was in need and distress, but at no time was she under their influence, nor did she fail to exercise her own reasonable and independent judgment. The intestate was a woman of attractive personality, had many friends and enjoyed their hospitality, and was admitted to their social activities, and at all times conducted herself as a woman of taste and sound judgment and of pleasing and attractive manners. In 1916, she had taken up her residence permanently in Westport and, acting upon her own judgment, decided to build a home for herself there, suitable to her tastes and needs. So far from influencing her to do this, the defendants recommended to her that she occupy a cottage already built, but she chose instead to erect a house which she did at an expense of about $26,000, placing it on ground owned by Mrs. McFarland from whom, after the house was completed, she procured a life lease at a nominal rental only. She discussed this phase of the matter with her brother-in-law, and fully understood the legal effect of building on land of another, and the lease was executed in the presence of her attorney. She had some difference with the builder regarding the cost of extras, and retained counsel and settled the matter under his advice. Not desiring to deal directly with the builder, she turned over from time to time as needed, in excess of $20,000 to Dr. McFarland and he paid the parties for her, with

the exception of the final balance of $6000 which she paid direct to the builder. Dr. McFarland also assisted her in keeping her check book written up, making some entries on the stub, and drawing some checks for her. During this period of her acquaintance with him, about $80,000 of her money passed through his hands, and in so far as these funds were confided to him by her for specific purposes, he fulfilled the trust with complete fidelity. Some of the money was for loans to him, made to her advantage and as an investment, and these were fully paid by him with interest save for a balance of substantially $1150 on open account which he was always ready and willing to pay. The trial court finds that the building of this house on the land of Mrs. McFarland was calculated to furnish her maximum enjoyment at minimum expense, and that it was wholly unsolicited by the defendants. The intestate left Westport permanently in May or June, 1921, and died in New York on September 27th, 1923, intestate.

The plaintiff contends as matter of law that the adjudications of the Court of Probate in the commitment and conservatorship proceedings, not having been revoked by a court decree, the intestate became and remained until her death, incapable, and that all her attempted contracts were absolutely void.

At the time covered by this action, therefore, the situation was this: The intestate was a woman who had suffered much in body and mind for many years. She had recovered her mental balance and received much other relief at the hands of these defendants, to whom she obviously felt she owed a debt of gratitude for their care of her in her distress and while she was without substantial means of her own. Her natural desire to be near them rather than with the sister with whom she had long had a controversy, led her to

spend much time visiting at their home, and eventually to the resolution to build a home near them, for her own pleasure and enjoyment. Though they advised her not to spend her money for the house, she insisted upon doing so, and she paid for it with the funds which she had secured by the contract with the plaintiff. At her own insistence and without any influence of theirs, she placed this house on a site which she desired upon the land of Mrs. McFarland. She thus was able to obtain a home without expending any money for land on which to build it, and to do this she obtained a lease for the term of her life, at a nominal rental of $1 a year, acting under the advice of counsel, and understanding fully the legal result of so placing the house on the land of another person.

Nineteen of the assignments of error relate to the conclusions reached by the trial court, and the overruling of the plaintiff's claims of law. In one form or another, these bear upon the vital question whether at the time of these transactions the intestate was or was not insane in law or fact and whether her contracts were valid, void or voidable. In our consideration of the requested changes in the findings, we have already indicated that there is abundant and conclusive evidence to support the conclusion of the trial court that she was in fact at this time, mentally sound and capable of contracting.

The appellants contend nevertheless that she was legally insane and incapable because the decrees of the Court of Probate had never been specifically annulled or set aside. What then was the force and effect of these decrees? There is a presumption of very general application that all persons are sane and capable, the burden of proof being on those who assert the contrary. *State* v. *Buonomo,* 87 Conn. 285, 288, 87 Atl. 977; *State* v. *Lee,* 69 Conn. 186, 199, 37 Atl. 75. On

September 15th, 1909, the Court of Probate on application of the mother of the intestate, found the latter to be insane and a dangerous person to be at large, and committed her to the care and custody of the Halle-Brook institution, there to be confined while such insanity continued or until she should be discharged in due course of law. General Statutes, Rev. 1902, § 2741, now General Statutes, Rev. 1930, § 1731. The effect of this inquisition and adjudication was to establish conclusively that, at that time, the intestate was insane. When a person is *non compos mentis* and not under guardianship, his contracts are voidable but not void. Cleaveland, Hewitt & Clark, Connecticut Probate Law, § 572; *Coburn* v. *Raymond* (1904) 76 Conn. 484, 488, 57 Atl. 116; *Walsh* v. *Feustel* (1919) 93 Conn. 366, 370, 105 Atl. 696; *Nichols* v. *Nichols* (1907) 79 Conn. 644, 657, 66 Atl. 161. The duration of her commitment was (1) while her insanity continued, *or* (2) until she be discharged in due course of law. General Statutes, Rev. 1902, § 2741, now General Statutes, Rev. 1930, § 1731. On January 1st, 1911, the intestate was officially discharged from the Halle-Brook and an entry was made on the books of that institution that she was discharged as cured. "The original order of commitment shall remain in force and effect until such patient shall be officially discharged by the authorities of such institution." Public Acts of 1909, Chap. 33, now General Statutes, Rev. 1930, § 1737. We hold that after January 1st, 1911, when the intestate was discharged as cured, the legal presumptions created by the commitment were entirely removed.

It remains to consider the legal effect of the adjudication of the Court of Probate on November 13th, 1909, and the appointment of the conservator. This action was taken just four weeks after her commit-

ment by the same court, and it was adjudged that the intestate was incapable of managing her affairs, and her mother was appointed conservator. She served until June 21st, 1911, when she tendered her resignation to the court. This was a few months after the intestate had been discharged from the Halle-Brook as cured. The effect of this adjudication of November 13th, 1909, was to deprive the intestate of the possession of her property and render her conclusively incapable of making valid contracts in relation thereto while the conservatorship continued. It took her property from her possession and put it into the control of the Court of Probate, there to remain, *in custodia legis,* until restored to her by judicial action. *Johnson's Appeal* (1899) 71 Conn. 590, 598, 42 Atl. 662; Cleaveland, Hewitt & Clark, Connecticut Probate Law, § 567.

So long as such a situation continues the contracts of the ward are not simply voidable but absolutely void. Herein lies the distinction in legal effect between a conservatorship and an insanity commitment, the latter rendering the contracts of the party voidable only. Cleaveland, Hewitt & Clark, Connecticut Probate Law, § 572; 1 Willison, Contracts, p. 501, § 257; *Griswold* v. *Butler,* 3 Conn. 227; *Brown* v. *Eggleston,* 53 Conn. 110, 119, 2 Atl. 321; *Church* v. *Rosenstein,* 85 Conn. 279, 281, 82 Atl. 568.

As to the legal effect of the adjudication of June 21st, 1911, discharging the conservator: There being no evidence to the contrary, it will be presumed that the action taken by the court was regular and in accordance with the law. *Schuster* v. *Johnson,* 107 Conn. 133, 135, 139 Atl. 502; *Salt's Textile Mfg. Co.* v. *Ghent,* 107 Conn. 211, 215, 139 Atl. 694; *Wheatley* v. *Dubuc,* 93 Conn. 271, 276, 105 Atl. 616; *Woodruff* v. *New York & N. E. R. Co.,* 59 Conn. 63, 92, 20 Atl. 17.

The failure of the court to appoint a successor and the return of the possession of the property to the intestate, amounted in legal effect to a termination of the conservatorship, and thereafter the intestate was presumptively competent. *Griswold* v. *Butler,* 3 Conn. 227, 238.

The only legal ground for the action of the court in terminating the conservatorship and restoring possession of her property to the ward, was a finding that she had recovered her capacity and was again capable of managing her affairs and property. "To warrant the discharge of the [guardian] there must be clear and satisfactory proof that the party has been restored to mental soundness." 32 Corpus Juris, p. 674, § 325.

Since the statute requires it to be done, we must also presume that the possession of her property was in fact restored to the intestate upon the discharge of the conservator. General Statutes, Rev. 1902, § 243, now General Statutes, Rev. 1930, § 4821.

The conclusion is inevitable that the action of the Court of Probate in terminating the conservatorship under the circumstances, completely and legally annulled the original decree, leaving the intestate with presumed contractual capacity.

Our conclusions of law and the finding of facts as corrected taken together, dispose adversely to her, of the plaintiff's allegations in the complaint, of incompetence and incapacity on the part of the intestate to manage her affairs on the one hand, and the domination and control, and improper and fraudulent influence over the intestate, as well as the fraudulent conspiracy, on the part of the defendants, on the other hand.

Three assignments of error relate to the action of

the trial court in refusing the plaintiff a trial of some of the issues to the jury.

In *Purdy* v. *Watts,* 91 Conn. 214, 99 Atl. 496, the amended complaint set up in separate counts, a claim for the cancellation of a deed on the ground that the grantor was an incompetent and that his signature to the deed had been procured by undue influence and fraud, and a further claim for damages based upon the alternative theory that the deed was valid, and the allegation that the consideration named in the deed had not been rendered to the grantor as the deed provided. The first claim clearly presented an equitable issue with a suitable prayer for relief, and was properly triable to the court, while the second or alternative claim, based as it was on the theory that the deed was valid, raised a legal issue of breach of contract for which the parties could demand a jury trial. There was a second trial of that case. Before the first trial the court had ordered all issues of fact to be tried to the jury, the defendant not then having asked, as was his right, to have the facts upon which the respective claims for legal and equitable relief rested, stated in separate counts. More than two years had passed when the case came on for the second trial, when the defendant, by permission of court, moved for such a separation, and the court granted the motion and afterward ordered that the equitable issues be tried to the court and tried first. We held that the defendant was not deprived of his right to claim a separation of causes of action by having allowed the case to be once tried without making this motion, and that the court had a discretion, which was properly exercised, in modifying the original order. After the issues were separately stated it appeared to the trial court, as stated in its memorandum, that the principal issues in the case were equitable isues, and that under the circumstances,

justice would best be subserved by a trial to the court of the issues adapted to the claim for equitable relief, and this was clearly correct.

In the present case the amended complaint upon which the case was tried, contains but a single count and the cause of action upon which the claims for relief rest is, that the intestate was incompetent to make the contract, and that by conspiracy and fraud and by the use of undue influence, the defendants procured the intestate to act as she did, as a result of which they were unjustly enriched. The relief demanded— that the defendants be declared trustees to hold the property for the benefit of the estate of the intestate— is a purely equitable relief, and there is thus presented a situation closely analogous to that in the case of *Purdy* v. *Watts, supra.* The existence of incidental or subordinate issues of fact involved in the determination of that issue, created no constitutional right in the plaintiff to demand that the incidental questions of fact be tried to the jury, though the court could have so ordered in its discretion. 21 Corpus Juris, p. 585, § 721.

The jury forms no part of our equity system, though its use is permitted by statute upon issues of fact in equitable actions. General Statutes, § 5625. Therein the court has the power to determine all issues. The only pertinent constitutional provision is that the right of trial by jury shall remain inviolate, that is, as it was before the Constitution was adopted. *Seeley* v. *Bridgeport,* 53 Conn. 1, 2, 22 Atl. 1051. Incidental issues of fact involved in equitable issues, were determinable by the court long prior to the adoption of the Constitution, and this provision therein does not concern such issues. Moreover, our statute prescribes what may be claimed as of right for trial to the jury; ". . . appeals from probate involving the validity of a

will or paper purporting to be such, appeals from the doings of commissioners on insolvent estates, and, except as hereinafter provided, civil actions involving such an issue of fact as, prior to January 1, 1880, would not present a question properly cognizable in equity"; and also what cases are for the court: "All cases not entered in the docket as jury cases under the foregoing provisions, including actions wherein the plaintiff sues for a debt due by book to balance book accounts, actions wherein an account is demanded and judgment rendered that the defendant shall account, writs of habeas corpus, prohibition and ne exeat, complaints for divorce and all other special statutory proceedings which, prior to January 1, 1880, were not triable by jury, shall be entered on the docket as court cases, and shall, with all issues of law and issues of fact, other than those hereinbefore specified, which may be joined in actions entered on the docket as jury cases, be disposed of as court cases." General Statutes, Rev. 1902, § 720, now General Statutes, Rev. 1930, § 5624; *Meriden Savings Bank* v. *McCormack*, 79 Conn. 260, 262, 64 Atl. 338; *Purdy* v. *Watts*, 91 Conn. 214, 215, 99 Atl. 496; *Bristol* v. *Pitchard*, 81 Conn. 451, 453, 71 Atl. 558; *Bisnovich* v. *British America Assurance Co.*, 100 Conn. 240, 123 Atl. 339.

In view of the conclusions we have reached as to the basic claims of the plaintiff, the two remaining assignments of error involving rulings on evidence, do not require consideration.

There is no error.

In this opinion the other judges concurred.