AUGUSTINE F. LINAHAN ET AL., TRUSTEES *v.* AUGUSTINE F. LINAHAN ET AL.

MALTBIE, C. J., BROWN, JENNINGS, ELLS and DICKENSON, Js.

Argued June 13—decided November 8, 1944.

*John Q. Tilson, George E. Beers* and *Thomas A. Grimes,* with whom were *Hilbert I. Trachman* and *Irving R. Krosner* of the New York bar, for the appellant (defendant Anna L. Linahan).

*Ralph H. Clark,* and *Frank Weinstein* of the New York bar, with whom, on the brief, were *Edward L. Reynolds* and *James J. Corrigan,* for the appellees (plaintiffs).

*David M. Reilly,* for the appellees (named defendant et al.).

MALTBIE, C. J. The plaintiffs, three children of Thomas H. Linahan, deceased, brought this action, describing themselves as surviving trustees under a trust established by their father by a written agreement to which he, the plaintiffs and his other child, James, were the parties. James, named in the agreement as a fourth trustee, died in 1936, leaving a widow but no children. She is executrix of his estate. The plaintiffs as individuals and James's widow, individually and as executrix, were made defendants. The issues concern her rights as an individual and as executrix to share in the property included within the agreement and now in the possession of the plaintiffs, and in the income from it. The trial court found that she had no such rights either as an individual or as executrix. She has appealed in both capacities. In our discussion of the case we shall refer to her as the defendant, only distinguishing between her claims in one capacity or the other when necessary to make clear our decision. The issues presented are many; the finding is long; and the defendant has made numerous assignments of error seeking corrections in and additions to it. Many of these are referred to in her brief only under a general statement that they ought to be made, and such a claim imposes no obligation upon us to regard them. We have considered the other assignments of error as to the finding and have taken into account such few material corrections or additions as should be made. We shall not, however, discuss these assignments or state the facts except in so far as necessary to make clear the application of the pertinent rules of law; and we shall consider no claims of law not necessary to our decision.

The complaint as finally amended concluded with the allegation, usual in a suit by trustees for advice, that the plaintiffs could not with safety to themselves

or the rights of the parties complete their duties and distribute the fund in their possession without the advice of the court; but it then proceeded to claim a declaratory judgment to determine whether a trust had been validly created, whether it had been legally continued beyond its original term by a certain supplementary agreement, what were the rights and powers of the plaintiffs, and what rights James's estate and his widow individually had in the fund and its income. The defendant filed an answer and counterclaim which, in addition to admissions and denials, contained twenty-one so-called defenses, and concluded with a prayer for judgment dismissing the complaint and declaring that James's estate, or, in the alternative, his widow, had certain rights in the fund and its income. The defendant filed a general claim of the case for the jury docket. The court, on motion, ordered that the defendant file a list of the issues of fact which she claimed should be submitted to the jury. She filed a statement of such issues, in thirty-two paragraphs. The plaintiffs then moved to have the case stricken from the jury docket. The motion was granted, and this is assigned as error.

As regards the cause of action stated in the complaint, the question so raised is very largely determined by our decision in *Meriden Savings Bank* v. *McCormack*, 79 Conn. 260, 64 Atl. 338. That was a suit in the nature of interpleader, brought under a statute enacted subsequently to the adoption of our constitution in 1818; the action as such was not, therefore, within its provision that "The right of trial by jury shall remain inviolate"; Const. Conn. Art. I § 21; and it was within the statutory provision that all "special statutory proceedings which, prior to January 1, 1880, were not triable by jury, shall be entered on the docket as court cases." General Statutes, § 5624. We pointed

out that the issues in the case were such as might have been fully litigated in equity without resort to the statute and that it could not properly be claimed for the jury. So, in the case before us, an action to secure a declaratory judgment is a special statutory proceeding within the provisions of § 5624; the complaint in this case is in reality one by trustees seeking the advice of a court sitting in equity as to the performance of their duties; the cause of action stated in it is in its essence an appeal to the equity jurisdiction of the court; and it could be maintained in equity without resort to the statute. The provision in the rules (Practice Book, § 251) concerning declaratory judgments, that issues of fact in actions for such relief "may be submitted to the jury as in other actions," does not enlarge the right to a jury trial which would otherwise exist. The cause of action stated in the complaint is not one which the defendant had a right to have tried by jury.

The first seven so-called defenses allege matters properly presented only by pleas in abatement and to the jurisdiction; they afford no grounds for a counter-claim and may be disregarded; and the prayer for relief that the complaint be dismissed, evidently based on them, falls with them. For the most part, the other "defenses" merely state the defendant's claims or allege facts in support of them within the scope of the cause of action set forth in the complaint. The answer and counterclaim do contain certain allegations upon which the defendant bases a prayer for relief by way of adjudication of her rights in the fund and its income if it should be decided, as she claims, either that no trust was ever validly established or that it had terminated for reasons extraneous to the agreements of the parties. In either of these events the defendant would not be entitled to receive any of the property except by reason of her deceased husband's right to participate

in the distribution of his father's estate; and the rights of the husband's estate would have to be worked out through the medium of a resulting trust. *Bassett* v. *Pallotti, Andretta & Co., Inc.*, 117 Conn. 58, 62, 166 Atl. 752; *Waterbury Trust Co.* v. *Porter*, 131 Conn. 206, 217, 38 Atl. (2d) 598. A cause of action based upon the claimed existence of such a trust is one in equity not triable as of right to the jury. *Doris* v. *McFarland*, 113 Conn. 594, 608, 156 Atl. 52. The counterclaim does not state a cause of action triable as of right to the jury.

It is true that, though a cause of action is not as a whole triable by jury, issues may be presented upon the pleadings which a party has a right to have submitted to them. *Miles* v. *Strong*, 68 Conn. 273, 286, 36 Atl. 55; *Dawson* v. *Orange*, 78 Conn. 96, 100, 61 Atl. 101; *National Bank of Commerce of New London* v. *Howland*, 128 Conn. 307, 310, 22 Atl. (2d) 773. The principal issues of fact raised by the pleadings are in substance that the agreement was never intended to create a trust but was a subterfuge for the accomplishment of other purposes, that there had been no such transfer of property under its terms as to make effective any intended trust, and that the trust had been abandoned or terminated by agreement of the parties, with subordinate claims of estoppel, waiver and laches. Most of these issues were also included in the statement of issues of fact to be submitted to the jury filed by the defendant, but they are there submerged among issues of law and matters of detail which could not properly be incorporated in the interrogatories upon which to base a special verdict. None of these issues as they appeared in the pleadings when the case was ordered stricken from the jury docket was so distinctly cognizable at law as to give the defendant a right to have it submitted to a jury. *Berry* v. *Hartford*

*National Bank & Trust Co.*, 125 Conn. 615, 618, 7 Atl. (2d) 847; *Dzubin* v. *Dzubin*, 121 Conn. 646, 649, 186 Atl. 652. In the *Berry* case, we said that the trial court might properly have construed the complaint as one in which the plaintiffs sought to have certain funds the defendant claimed to hold in trust delivered to them, with an accounting by it of its handling of the funds and damages for breach of trust, and we held that the court did not err in striking the case from the jury docket. We reach a like conclusion in this case.

The agreement, dated December 29, 1919, was signed by Thomas, the father, and by his four children, James, Lulu, Agatha and Augustine, both as individuals and as trustees. It recited that Thomas "hereby sells, assigns, conveys and transfers" to them as trustees certain personal property listed in it, consisting of corporate stocks, mortgage bonds, mortgage notes and a small unsecured note, and that he might transfer to them other property to become a part of the fund. It went on to provide that the income less expenses and taxes was to be paid to him during his life; that after his death it was to be divided among the four children, four-tenths to be paid to Lulu and two-tenths to each of the others; that this was to continue until January 1, 1930, unless the trustees should agree to a continuance of the trust "as hereinafter provided"; that the rights of the children were to vest in them upon the signing of the agreement, "subject, however, to the property being revested" in Thomas should the trust be dissolved during his life; that on January 1, 1930, unless the children agreed to a continuance of the trust "as hereinafter provided," the principal was to be divided among them in the same proportions as specified for the division of the income; that the children were to "make wills" by which, after provision for such charitable gifts as they saw fit to make and for their

respective husbands or wives, by a life interest under a trust of all or a portion of the property "vested in them" under the agreement, the balance of the property was to be given to their children, or, if there were none and no descendants of children, or if there were such children and they should die before reaching twenty-one years of age, then to the brothers and sisters of the testator or testatrix; that if, "at the time of their death," any of the children had not complied with the requirement just stated, his or her share in the trust fund was to vest in his or her children or the descendants of deceased children or, if there were none, then in Thomas' surviving children, or the descendants of any who had died; that the trustees might at any time, by unanimous vote, dissolve the trust; that, if this happened during the life of Thomas, the trustees were to convey the trust fund to him to be his absolutely, but, if the trust was dissolved after his death, the property was to be divided among the children in the proportions stated; and that in deciding any questions pertaining to the trust Lulu was to have two votes and the others one each; and the children expressly accepted the trust. The agreement contained other provisions not necessary to detail; but there was no provision as to a continuance of the trust except those we have quoted. On the same day the agreement was executed, Thomas conveyed to Lulu certain real estate and she signed a declaration that she held the land, as well as a certain mortgage note, "subject to, and as a part of, and in accordance with the terms" of, the trust agreement. Also on that day, James signed a declaration that a casket manufacturing business conducted by him, together with a certain leasehold and option to purchase real estate apparently connected with it, was in reality the property of his father, Thomas, and that, in language like that last quoted, he

held the business and property subject to the trust; and these property interests were sold, assigned and transferred by Thomas by deed to the four children as trustees, "as part of, and are to be owned and held by said trustees as part of, the property belonging to the trustees under" the trust agreement.

The defendant contends that there was no such transfer of the property specified in the agreement as was necessary for the establishment of the trust. It is, generally speaking, true that where, by agreement inter vivos, a donor desires to establish a voluntary trust by appointing a third person as trustee, he must make such a transfer of the property that nothing remains to be done on his part to make the gift effective. *Organized Charities Assn.* v. *Mansfield,* 82 Conn. 504, 509, 74 Atl. 781. Much learning has been expended in the effort to determine the scope of this principle, no little of it partaking of common-law technicalities. If regard be had to the ever-increasing merger of legal and equitable rights, the modern law may be fairly summed up in this way: Aside from questions of intention, the basic reason for the rule is that equity will not aid one who has no claim other than that another has proposed to extend to him his voluntary bounty; but if the donor has done everything necessary to vest the trustee with a title or right sufficient to effectuate the trust, then equity will sustain and enforce it. Bispham, Principles of Equity (11th Ed.), §§ 45, 46; 3 Pomeroy, Eq. Jur. (4th Ed.), § 997; 1 Perry, Trusts (7th Ed.), §§ 100, 101; 1 Scott, Trusts, § 32.2. "The key to the solution of the question . . . is to be found in the equitable principle, now well established and uniformly acted on by courts of chancery, that a voluntary gift or conveyance of property in trust, when fully completed and executed, will be regarded as valid, and its provisions will be enforced and carried into effect

against all persons except creditors or *bona fide* purchasers without notice. It is certainly true that a court of equity will lend no assistance towards perfecting a voluntary contract or agreement for the creation of a trust, nor regard it as binding so long as it remains executory. But it is equally true that if such an agreement or contract be executed by a conveyance of property in trust, so that nothing remains to be done by the grantor or donor to complete the transfer of title, the relation of trustee and *cestui que trust* is deemed to be established, and the equitable rights and interests arising out of the conveyance, though made without consideration, will be enforced in chancery." *Stone* v. *Hackett*, 12 Gray (78 Mass.) 227, 230. While it is frequently stated that the transfer must be such as to vest the legal title in the trustees, it is sufficient if it be made to a third party for them under such circumstances that the donor no longer has any dominion over the property. Restatement, 1 Trusts, § 35, comment a; 1 Scott, op. cit., p. 201. The principle is the same as that which governs in the case of gifts and we have held this to be so as to them. *Burbank* v. *Stevens*, 104 Conn. 17, 22, 131 Atl. 742.

The mortgage notes included in the agreement are all described in substantially the same way, of which this is an example: "A mortgage note for one thousand dollars ($1000.), made by S. S. Cohen, payable to the order of the party of first part, and secured by a mortgage on property at No. 111 Pine Street, New Haven, Conn." Although these notes were in form negotiable, they could be transferred by an assignment, either indorsed on them or embodied in a separate instrument; *Queensboro National Bank* v. *Kelly*, 48 Fed. (2d) 574, 576; *State* v. *McClellan*, 82 Vt. 361, 364, 73 Atl. 993; 5 U. L. A. (1 Negotiable Instruments), p. 495; 8 Am. Jur. 39, § 301. The trust agreement con-

tained an express assignment of them to the trustees; they were delivered to one of them, Augustine, as custodian for all; and delivery to him on their behalf was all that was necessary to vest possession in them. *Talbot* v. *Talbot,* 32 R. I. 72, 94, 78 Atl. 535; see *Main's Appeal,* 73 Conn. 638, 644, 48 Atl. 965. By these acts the trustees were vested with power to sue upon and collect the notes. *Torrington Creamery Co., Inc.* v. *Davenport,* 126 Conn. 515, 521, 12 Atl. (2d) 780. The assignment in the agreement was sufficient also to pass to them the interest Thomas had in the mortgages; *Woronieki* v. *Pariskiego,* 74 Conn. 224, 227, 50 Atl. 562; see 19 Rec. & Briefs 466; in fact, the security of the mortgages would pass to them as an incident to the assignment of the notes; *Roth* v. *Stein,* 100 Conn. 668, 677, 124 Atl. 546; and they could bring actions to foreclose them. *Pettus* v. *Gault,* 81 Conn. 415, 420, 71 Atl. 509. As regards the mortgage notes, nothing remained to be done by Thomas to vest in the trustees the right to collect the sum due upon them for administration under the trust, and the requirements of the principle as to a transfer of property to constitute a trust were sufficiently met. See *Camp's Appeal,* 36 Conn. 88, 92. We do not overlook the decision of the Master of the Rolls in *Woodford* v. *Charnley,* 28 Beav. 96, 54 Eng. Rep. R. 302, where, in a somewhat similar case, he held that a trust was not validly established, on the ground that the mortgage debtor upon payment of the debt would be entitled to a deed of reconveyance, which the trustees, not having received a formal conveyance of the property, could not give; but that conclusion does not accord with the decisions of our court above cited.

Nothing more need be said to establish the sufficiency of the transfer of the unsecured note. The finding that "all of the securities" listed in the agree-

ment were at the time of its execution delivered to Augustine on behalf of the trustees can only mean that the certificates representing the stock were so delivered. They were, so far as the finding shows, not then indorsed, but in subsequent years substantially all of them were transferred of record to Lulu as custodian for the trustees. If, under § 3429 of the General Statutes, the delivery of the certificates, with the assignment of the shares in the trust agreement, was not effective to transfer them to the trustees within the principle above stated, the lack as to most of them was sufficiently supplied when they were later formally transferred to Lulu. Under the authorities we have referred to, no transfer of property is necessary where there is a sufficient declaration that one holds property in trust for another; Lulu's declaration that she held the various pieces of real estate transferred to her by Thomas under the trust was adequate to bring those properties within it; and that the declaration of trust was not recorded is of no consequence as regards the parties to this action. 1 Perry, op. cit., § 105. The casket business at the time the agreement was made was being conducted by James in his own name, and continued to be so conducted until it was incorporated in 1924; while James declared that Thomas owned the business, the latter, so far as the finding shows, never had possession of it or its tangible assets; and his assignment to the trustees, coupled with the declaration by James that he held it in trust, was a sufficient compliance with the rule. The bonds mentioned in the agreement had been pledged to secure a debt of James, and so were not delivered at the time the trust agreement was executed; but it is not necessary to trace the rather complicated transactions in which they were involved, detailed in the finding. The claim of the defendant is not that any property now in the

hands of the plaintiffs is not a part of the trust fund if a trust was validly established, but that no trust ever came into existence. That is not so as regards any of the property with the possible exception of the bonds; and even if there was a failure as to them, their inclusion in the trust was not so essential to its existence that without them it would fail. A trust was validly established.

The defendant claims, however, that, even if the requirements for the establishment of a trust were met, there was in reality no intention to establish one and the whole plan was nothing more than a device to accomplish an ulterior purpose, particularly the avoidance of taxes, and that, if a trust actually came into existence, it had ceased by abandonment; and she largely relies upon the same facts to support both contentions. The facts found by the court, with such minor corrections and additions as we can make, leave no doubt that the property and its income were not managed as a trust fund should have been. To cite certain instances: The securities were never placed in the names of the trustees, as such, and the funds were not segregated in an account in their names but were carried in individual accounts in the names of Thomas and Lulu; the transactions with the property were for the most part carried on in her individual name; there was a mingling of principal and income, and of trust funds with the personal funds of Thomas and the children; the trustees made no returns for income tax purposes until after 1940, but Lulu included the trust income in her personal returns; in a controversy with the state tax commissioner they made claims quite conflicting with those put forth in this action; certain real estate forming a part of the trust was given to certain charities; and they distributed portions of the principal among themselves and in doing so divided it equally

instead of in the portions provided in the agreement. As a typical instance of a disregard of the way in which the funds should have been handled, the defendant calls attention to an agreement made with Rose Coogan; Thomas in his will provided that a trust for $10,000 should be set up for her; but the children entered into an agreement with her to take, instead, an annuity of $1000 a year; this was paid from the account of Lulu, in which the funds of the trust were carried. The defendant devotes considerable space in her brief to an attack upon a finding that James, because of his financial condition, requested that none of the property be transferred into the names of the trustees; she contends that there was nothing in James's situation which would reasonably justify a desire on his part not to appear as one of the trustees; but there was evidence directly supporting the finding, and we cannot say that the court could not accept that testimony as truly representing James's attitude of mind, however mistaken it might feel him to have been.

It is to be noted that the whole arrangement was a family matter, and the trial court could well conclude from the evidence that the attitude of the children was that the money was theirs, that they were not injuring anyone by the way in which it was used, and that, having the right to terminate the trust as a whole, they could terminate it in part by dividing portions of the principal among themselves. In the absence of any question as to a breach of trust, no particular virtue attaches to the formal designation of a person as trustee if he is treated and acts as such. *Ryder* v. *Lyon*, 85 *Conn.* 245, 250, 82 Atl. 573; and see *Shannon* v. *Eno*, 120 Conn. 77, 81, 179 Atl. 479; *Chapter House Circle* v. *Hartford National Bank & Trust Co.*, 121 Conn. 558, 578, 186 Atl. 543; Restatement, 1 Trusts,

p. 459. It appears from the finding that James either participated in or knew of and consented to the various transactions, and while the finding in this regard is to some extent attacked by the defendant, it is supported by direct testimony or reasonable inference. We are not here concerned with any question of maladministration or breach of trust by the trustees; the claim is that there never was any real intention to create a trust, or, if it was created, it was abandoned. The issues so raised must be primarily decided on a conclusion as to the intention of the parties. We cannot hold that the trial court erred in finding in effect that, despite the exceedingly loose way in which the fund and its income were handled, a trust did come into existence, and that it was not thereafter abandoned.

It is the contention of the defendant that, if the trust is valid, her decedent, James, became, at the execution of the agreement, vested with an interest in the trust fund of which he was never divested. He did not comply with the stipulation that the children should make wills containing certain provisions and, if the terms of the agreement are to be applied, the situation would fall within the alternative disposition of the property, that it go to the surviving children or the descendants of any who may have died. The language of the provision is too clear and positive to permit it to be regarded as in any sense precatory. *Cumming* v. *Pendleton,* 112 Conn. 569, 575, 153 Atl. 175; *Burley* v. *Maguire,* 127 Conn. 242, 245, 16 Atl. (2d) 358. These provisions are not made nugatory because they create a condition subsequent, failure to comply with which would divest any child of the interest which earlier in the agreement it was stated would, upon its execution, vest in him or her; a gift expressed to be absolute may be cut down to a lesser estate by subsequent provisions couched in "language clearly indicating intent and

equivalent to a positive provision." *Mansfield* v. *Shelton,* 67 Conn. 390, 394, 35 Atl. 271; *Burley* v. *Maguire,* supra, 246. The contention that the requirement as to the terms of a will to be executed by each child was intended to be effective only if a child died before Thomas hardly merits serious comment; the principal of the fund was to be distributed only at the end of the period it was to run; only at that time would this provision be effective in determining the rights of the parties; that time might well be after the death of Thomas; his purpose was clearly to make such provisions that the bulk of the fund should ultimately go to his grandchildren or their descendants; the death of one of his children without making a will such as he stipulated would just as much defeat that purpose if it occurred after his own as it would if the child predeceased him.

The defendant individually makes the further claim that the direction to the children as to the wills they should make gave to them a power of appointment, and that when James devised and bequeathed all his property real or personal to his wife, as he did, this constituted a valid exercise of the power. "A power of appointment is a power of disposition given to a person over property not his own by some one who directs the mode in which that power shall be exercised by a particular instrument." *Jessel, M. R.,* in *Freme* v. *Clement,* 18 Ch. D. 499, 504. "The donor does not vest in the donee of the power title to the property, but simply vests in the donee power to appoint the one to take the title. The appointee under the power takes title from the donor, and not from the donee of the power." *People* v. *Kaiser,* 306 Ill. 313, 317, 137 N. E. 826. The ultimate beneficiary really takes from the person who created the power, "the donee of the power acting as a mere conduit of the former's bounty."

*Bartlett* v. *Sears,* 81 Conn. 34, 42, 70 Atl. 33. Under the agreement, the children, subject to such limitations as it contained, became vested with rights to the income and principal of the fund, subject to the provision that each of them should make a will as required in the third article; when the terms of this article were met, the condition was removed and the right of each of them to the income or principal became absolute; and any person receiving any of the property by his or her will received it, not from the father, but from him or her. The short answer to the defendant's contention that James's will was the exercise of a power of appointment is that the direction in the agreement as to the making of wills did not create a power of appointment. *Luques, Appellant,* 114 Me. 235, 239, 95 Atl. 1021. It was a condition subsequent. When James died without complying with it, there was no interest in the fund which could pass to his estate.

The agreement provided, as we have stated, that the trust would expire on January 1, 1930, unless the parties agreed to a continuance "as hereinafter provided," but it contained no further provisions as to continuance. On October 26, 1927, the trustees signed a writing to the effect that the trust agreement should continue "as stated in said agreement" until January 1, 1940, unless previously terminated as provided in it, "with the same effect as if said date had been originally inserted in said agreement as the termination. thereof." One may surmise the thought to have been that the agreement might be continued by unanimous vote of the trustees as was provided in regard to its termination. However that may be, they all became parties to the continuance. At the time the writing was signed, the father was present and a writing in the form of a letter from him to them was read in which he earnestly requested that the trust be continued until

January 1, 1940. It does not admit of doubt that the intent was to continue the trust as established in the original agreement, with all its incidents, not, as the defendant claims, to continue it merely for administrative purposes. The defendant claims further that if this is so the agreement for continuance must fail because it might adversely affect the rights of children of the parties, born or unborn, or others claiming through them. Thomas' children Augustine and Lulu have never married; James married but had no children; Agatha married and has a son, Basil, born previous to the execution of the agreement in 1919; and he has a child. The defendant suggests that if, between the date originally set for the termination of the trust and that fixed in the agreement of continuance, Basil had died without descendants and another child had been born to Agatha, that child would take to the exclusion of Basil's heirs, and that the continuance would therefore deprive these heirs of a right they might have had under the original agreement; and that somewhat similar results might have come about if any of Thomas' children other than Agatha had had children. If certain further elements should be added to the case stated, that is, that Agatha did not make a will as required in the trust agreement or, if she did, that Basil's death did not occur until after he had reached the age of twenty-one, there might, in certain circumstances, have been some substance to this claim. But as no child was born to any of Thomas' children after January 1, 1930, and Basil was alive on January 1, 1940, the continuance did not, as matter of fact, adversely affect any grandchild of Thomas or anyone claiming an interest in the estate of such a grandchild. A bare possibility, which has not occurred and cannot now occur, is insufficient ground upon which to hold invalid the agreement of the parties. See *Brooks Bank*

& *Trust Co.* v. *Beers,* 120 Conn. 477, 481, 181 Atl. 391; *Congregational Home Missionary Society* v. *Thames Bank & Trust Co.,* 127 Conn. 1, 11, 14 Atl. (2d) 626.

The defendant also claims that the plaintiffs are guilty of laches and are estopped from taking the position that there was a trust which continued in existence until the death of James. There are no grounds whatsoever upon which the first claim could rest. The basis of an estoppel is unjust advantage which, if the principle were not applied, one person would be able to take of another; it rests upon "the misleading conduct of one party to the prejudice of the other." *MacKay* v. *Aetna Life Ins. Co.,* 118 Conn. 538, 548, 173 Atl. 783. It is a fundamental rule as regards estoppel by conduct that the person claiming an estoppel "must show that he exercised due diligence to know the truth; . . . and that he was destitute not only of knowledge of the true state of things, 'but also of any convenient or available means of acquiring such knowledge.' " *Weidemann* v. *Springfield Breweries Co.,* 78 Conn. 660, 664, 63 Atl. 162; *Graham* v. *Southington Bank & Trust Co.,* 99 Conn. 494, 509, 121 Atl. 812; *Myers* v. *Burke,* 120 Conn. 69, 76, 179 Atl. 88. As we have pointed out, James was from the beginning a participant in the manner in which the property was handled; he benefited substantially from the methods followed; and there is no suggestion in the record that he did not know as much about the various transactions as did the plaintiffs. Certainly his widow, who derives all her rights from him, cannot claim that they are estopped from maintaining that a trust was established and continued until January 1, 1940. 31 C. J. S. 399.

Most of the rulings on evidence assigned as error concern matters immaterial as regards the issues we hold determinative of the appeal. Only three require specific mention. When an accountant called as a wit-

ness by the defendant was under cross-examination, counsel for the plaintiffs asked to be permitted to see a sheaf of papers which the witness had used in the course of his direct testimony; over an objection that papers were included in the sheaf which the witness had not used, the court ruled that plaintiffs' counsel might inspect them; but as it does not appear from the finding to what extent, if any, they were used by counsel or that any harm could have resulted to the defendant, we have no need to consider the ruling. It does not appear from the finding that a question, asking whether James had acted as a trustee, which the trial court ruled to be admissible, was answered, and this ruling requires no discussion. *Fernandez* v. *Thompson,* 104 Conn. 366, 367, 132 Atl. 895. The remaining claim of error concerns the admission in evidence of the paper, in the form of a letter signed by the father and addressed to the children, in which he requested the continuance of the trust and which the trial court finds was read to the children in the presence of the father at the time the extension agreement was signed by them. It contained these words: "I wish that the property that I have transferred to the trust, which trust you have this day agreed to continue until January 1, 1940, should be kept in trust and in the charge of you all as long as any of you live. . . . I trust you will heed my wishes in this respect because I am sure that the trust property will prosper if this is done. . . ." The objections pressed in the defendant's brief are that the letter was inadmissible as an attempt to vary the terms of the original trust agreement or the agreement for the continuation of trust and that it was hearsay. There was nothing in the terms of the letter which in any way would vary the terms of either agreement. It was admissible upon two grounds: One of the defendant's claims, as pointed out above, was that

the whole transaction was not in reality intended to be a trust but the agreement was merely a device adopted to accomplish some ulterior purpose. The letter, written during the course of the administration of the property under the agreement, was admissible as tending to show that the father really did intend a bona fide trust; it was a verbal act evidencing intention, not a hearsay statement offered to prove the truth of any fact stated in it; and that the father had deceased does not affect its admissibility. *Spencer's Appeal*, 77 Conn. 638, 641, 60 Atl. 289; *Doolan* v. *Heiser*, 89 Conn. 321, 324, 94 Atl. 354; *Klock* v. *Pierson*, 123 Conn. 465, 467, 196 Atl. 147; 6 Wigmore, Evidence (3rd Ed.), §§ 1772 et seq. Moreover, the father was one of the parties to the original agreement; he was directly concerned in the continuance of the trust because of the provision that, should it be dissolved during his lifetime, the property would revest in him; and the letter was admissible to show his consent to the postponement of the time of its termination.

The final claim of the defendant is that, in any event, as executrix of James's estate she is entitled to an accounting of all income received from the property from the day Thomas died, September 24, 1929, to the date of James's death, April 13, 1936. The trial court found that, commencing October 21, 1929, and continuing thereafter up to and including April 2, 1936, distributions of income were made at least every three months to the four children in the proportion of four-tenths to Lulu and two-tenths to each of the other three; and that James participated in these distributions of income and received and accepted $26,000 as his share thereof. These findings are not attacked in the assignments of error in any respect material to the claim we are discussing; nor are we asked to amplify them in any respect. The natural purport of the words

used is that James received through these distributions all the income to which he was entitled up to April 2, 1936. This interpretation is fortified by the fact that one provision in the judgment is that the estate of James is entitled to such unpaid income as may have been due to him from April 2, 1936, to April 13, 1936. The prayers for relief in the so-called counterclaim did not ask an accounting, but an adjudication that the estate of James, or, in the alternative, the defendant individually, is entitled to a certain share in the principle and income of the fund. The judgment is responsive to these prayers for relief and, on the finding, the defendant is not entitled to anything more.

There is no error.

In this opinion the other judges concurred.