75 F.3d 1182
 Jerome A. MAHER and John R. Gravee, Plaintiffs-Appellants,
v.
HARRIS TRUST AND SAVINGS BANK, Horizon Federal Savings Bank,
F.S.B., and Resolution Trust Corporation, as
receiver of Horizon Federal Savings
Bank, Defendants-Appellees.
 No. 95-1103.
 United States Court of Appeals,
Seventh Circuit.
 Argued Dec. 7, 1995.
Decided Feb. 5, 1996.
As Modified on Grant of Motion for Clarification Feb. 28, 1996.
Rehearing and Suggestion for Rehearing En Banc Denied May 20, 1996.
 
 Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 90 C 5118--James M. Burns, Judge.*
 
 
 1
 John O. Tuohy, Camillo F. Volini (argued), Chicago, IL, for plaintiffs-appellants.
 
 
 2
 Ann E. Acker, Chapman & Cutler, Chicago, IL, for Harris Trust and Savings Bank.
 
 
 3
 Wm. Carlisle Herbert (argued), Kathleen M. Burch, Hopkins & Sutter, Chicago, IL, for Horizon Federal Savings Bank, F.S.B.
 
 
 4
 Wm. Carlisle Herbert, Kathleen M. Burch, Chicago, IL, Karen Caplan, Federal Deposit Insurance Corporation, Washington, DC, for Resolution Trust Corporation.
 
 
 5
 Before LAY,** CUMMINGS and DIANE P. WOOD, Circuit Judges.
 
 
 6
 CUMMINGS, Circuit Judge.
 
 
 7
 The issue in this case is whether the creation of trusts established to provide deferred compensation to a bank's top executives, and bonuses paid to those executives, violated 12 C.F.R. §§ 563.39 and 563.39-1 (1987). Those sections prohibit thrift institutions from establishing pension plans and entering employment contracts that "could lead to material financial loss or damage" to the bank. Because we agree that the trusts and bonuses violated those sections, we affirm the district court's decision.
 
 Background
 
 8
 On May 19, 1987, the Board of Directors of Horizon Federal Savings Bank, F.S.B. ("Horizon"), a mutual savings institution in Wilmette, Illinois, approved the establishment of trusts to fund benefits under deferred compensation agreements with plaintiffs John R. Gravee, Horizon's President and Chief Executive Officer, and Jerome A. Maher, Horizon's Vice Chairman. Under the terms of the deferred compensation agreements, Gravee and Maher became entitled, upon termination or death, to an amount of trust proceeds at a rate of twenty percent per year, dating from 1985. However, under the terms of the trusts, commonly known as "rabbi trusts," Horizon continued to own the trust property for tax purposes and the property remained subject to the claims of Horizon's creditors. Thus plaintiffs' interests in the rabbi trusts were essentially those of unsecured general creditors.
 
 
 9
 In May of 1988, Horizon's Board of Directors approved the conversion of the rabbi trusts to "secular trusts." Under the secular trusts, Gravee and Maher constructively received the trust funds. In other words, the trust property was no longer a part of Horizon's general assets and thus was not available to Horizon's creditors. In establishing the secular trusts, and paying $340,387 in withholding for income taxes owed by Gravee and Maher as a result of the transaction, Horizon removed $1,114,024 of its capital from creditors' reach in 1988.
 
 
 10
 At the time Horizon created the secular trusts, its balance sheet and income projections were positive. However, Horizon's profitability was illusory; in reality, it was experiencing significant capital difficulties as a result of a number of factors. First, Horizon was nearing the end of the positive effects it experienced as a result of "purchase accounting." Horizon was formed in 1982 when three troubled thrifts were merged into First Federal Savings and Loan Association of Wilmette, then becoming Horizon. Under accounting methods allowed for this transaction, known as "purchase accounting," the assets of the acquired thrifts were given a balance sheet value that reflected the price the assets would receive if sold in the market at that time. This resulted in a "purchase accounting discount" on Horizon's interest-earning assets of about $80 million, which yielded "discounting income" to Horizon as the value was reduced at an accelerated pace in the following years. Because Horizon's merged liabilities exceeded the fair market value of its merged assets, purchase accounting provided that Horizon had a "goodwill" asset on its balance sheet to equate its assets and liabilities. Horizon chose to amortize that goodwill over a 40-year period, producing a yearly expense of about $2.9 million. In the years directly following the merger, the income resulting from "discounting income" substantially exceeded the goodwill expense, creating a positive effect on Horizon's financial statements. However, as the purchase accounting discount was depleted, the discounting income dropped below the value of the goodwill expense, resulting in a negative impact. The district court found that "it should have been clear from the time of the merger to anyone who looked into the matter, that the net effect would become irreversibly negative during fiscal year 1989." [Opinion and Order dated January 14, 1993, p. 8].
 
 
 11
 Additionally, much of Horizon's profits in the few profitable years following the merger were the result of non-recurring sales of mortgage-backed assets. From 1985 through 1987, interest rates in the United States declined significantly. See BUREAU OF THE CENSUS, U.S. DEPT. OF COMMERCE, STATISTICAL ABSTRACT OF THE UNITED STATES 1994, p. 525 (indicating that the effective rate on Federal funds fell from 10.23% in 1984 to 6.66% in 1987). This allowed Horizon to sell a large amount of its mortgage-backed securities at substantial profits. These sales depleted much of the potential benefits of the purchase accounting methods described above: When Horizon sold interest-earning assets carrying a purchase accounting discount, the discount associated with those assets was removed from the books and Horizon lost the future discount accretion income that would have been derived from those assets. These sales accelerated the date when the purchase accounting effect would turn from positive to negative.
 
 
 12
 Horizon's income projections during this time were also overly optimistic. In April 1988, at the same time Horizon published a four-year Strategic Plan that reflected a healthy .5 percent return on assets, the Board approved Horizon's actual budget for the fiscal 1988-1989 year, which predicted a return of only .36 percent. The substantially lower anticipated return on the actual budget existed because of a new accounting rule that would soon come into effect. The Competitive Equality Banking Act of 1987 ("CEBA") required the Federal Home Loan Bank Board ("FHLBB") to establish uniform accounting standards to be used by thrift institutions in determining compliance with FHLBB capitalization regulations. CEBA § 402(a), 101 Stat. 606. In January 1988, the FHLBB announced that it would require insured thrifts to account for all loan origination and commitment fees incurred after the first day of fiscal year 1989 in accordance with the Financial Accounting Standards Board Statement of Financial Accounting Standards No. 91 ("FASB 91").[1] Under FASB 91, Horizon would be required to defer $1.5 million in loan fee income during the first two quarters of fiscal 1989. When the defendants' expert witness, John Thoms, a certified public accountant, changed the operating plan to take into account FASB 91, it was apparent that the .5 percent return on assets would be unattainable.
 
 
 13
 By June 30, 1989, Horizon had become deficient in its capital by over $8 million. On July 8, 1989, Horizon's Board concluded that "unless economic conditions were such that Horizon had extraordinarily good earning during the next few years, the probability was that Horizon would not remain an independent mutual financial institution." Nonetheless, in August 1989 Horizon's Board approved bonuses for Gravee and Maher in the amounts of $50,000 and $42,000, respectively.
 
 
 14
 The final straw for Horizon came when Congress enacted the Financial Institution Reform Recovery and Enforcement Act ("FIRREA") in August of 1989. Under accounting principles prescribed under FIRREA, Horizon was no longer permitted to include the remaining goodwill asset from the 1982 merger in calculating its regulatory capital requirements. Primarily as a result, the Office of Thrift Supervision ("OTS") determined that Horizon had insufficient capital to meet the new FIRREA guidelines and an inadequate plan for overcoming that deficiency. On January 11, 1990, Horizon was placed in receivership by the OTS and the Resolution Trust Company ("RTC") was appointed as receiver. Gravee and Maher were terminated by the RTC and on January 29, 1990, they made a demand for the trust proceeds upon the trustee, Harris Bank. The RTC ordered Harris not to disburse the proceeds of the trust fund and Gravee and Maher sued. The RTC asserted as a defense that the trusts violated 12 C.F.R. § 563.39-1 (1987) and counterclaimed that the 1989 bonuses violated 12 C.F.R. § 563.39 (1987). The district court concluded that both the trusts and the bonuses were paid when they "could lead to material financial loss or damage" to Horizon and granted judgment to the RTC on plaintiffs' claims for compensation under the trust, and on the RTC's counterclaim for repayment of the bonuses.
 
 Discussion
 
 15
 Following a bench trial, we review the district court's factual determinations for clear error and its legal conclusions de novo. Northwestern Nat'l Ins. Co. of Milwaukee, Wis. v. Lutz, 71 F.3d 671 (7th Cir.1995).
 
 A. Violation of Regulations
 
 16
 With regard to the secular trusts, 12 C.F.R. § 563.39-1 (1987) (now 12 C.F.R. 563.47) requires that "a thrift institution shall not sponsor an employee pension plan which, because of unreasonable costs or any other reason, could lead to material loss or damage to the institution." Plaintiffs agree that the trusts in question are "employee pension plans" covered by this section. Thus the remaining question is whether the trusts were established when they "could lead to material financial loss or damage" to Horizon. Judge Burns answered that question in the affirmative, finding that at the time the secular trusts were created, information was readily available that indicated: (1) a substantial portion of Horizon's income for 1986 and 1987 was attributable to non-recurring sales of mortgage-backed assets; (2) the net purchase accounting effect of amortizing goodwill and accreting loan discount from the 1982 merger would become negative in 1989 and continue to be negative through 2021; and (3) the deferral effects of FASB 91 would be an independent cause of capital deficiencies beginning in 1989 and continuing for a minimum of three years. [Opinion and Order dated January 14, 1993, p. 9].
 
 
 17
 With regard to the bonuses, 12 C.F.R. § 563.39(a) (1987) provides in part:
 
 
 18
 (a) General Provisions ... An association shall not enter into an employment contract with any of its officers or other employees if such contract would constitute an unsafe or unsound practice. The making of such an employment contract would be an unsafe or unsound practice if such contract could lead to material financial loss or damage to the association....
 
 
 19
 Judge Burns found that "[a]t the time the bonuses were approved in August 1989, Horizon had failed to comply with minimum capital requirements, had reported continuing losses, and was in a precarious financial condition." [Opinion and Order dated January 14, 1993, p. 13]. Thus the court concluded that "approval of the bonuses 'could lead to material financial loss or damage' to Horizon and, therefore constituted an 'unsafe or unsound practice' in violation of 12 C.F.R. § 563.39(a)." Id.
 
 
 20
 Plaintiffs first attack Judge Burns's determinations by claiming that the trusts did not violate Section 563.39-1 because Horizon was solvent at the time the trusts were created, and in compliance with the capital requirements then in effect.[2] Judge Burns did expressly find that Horizon was "not ... insolvent" when the trusts were created in May of 1988. [Opinion and Order dated January 14, 1993, p. 10]. However, neither solvency nor regulatory compliance is the proper inquiry under Section 563.39-1. Judge Burns found that the decision to create the trusts "could lead to material financial loss or damage" to Horizon. That was the proper standard to apply under Section 563.39-1.
 
 
 21
 Next, plaintiffs argue that bonuses are not "employment contracts," and thus are not subject to Section 563.39(a). In support of their position, plaintiffs cite Cohen v. RTC, No. CIV. 90-1065-R(P), 1993 WL 282051 (S.D.Cal., May 10, 1993), in which the district court held that an institution's commitment to pay an employee a bonus was not an "employment contract" for purposes of 12 C.F.R. § 563.39 because it "d[id] not set forth the general terms and conditions of Cohen's employment, but rather provide[d] bonus eligibility and the method of calculating awards." Id. at * 11. The RTC filed a notice of appeal to the Ninth Circuit, but the case was settled prior to a decision. See Cohen v. RTC, 61 F.3d 725 (9th Cir.1995).
 
 
 22
 In the case at hand, both Gravee and Maher had written contracts that contained the following provision regarding annual bonuses:
 
 
 23
 For all services rendered by [Gravee/Maher] under this Agreement, Horizon Federal Savings Bank shall pay or cause to be paid to [Gravee/Maher] the following:
 
 
 24
 * * * * * *
 
 
 25
 (b) For each year during the term of this Agreement, a bonus in such amount as the Board may determine to be appropriate, provided that [Gravee/Maher] meets a performance standard to be reasonably established by the Board.... Bonuses payable under this paragraph 6(b) shall be in addition to base salary [and] any other bonuses or benefits payable under this Agreement.
 
 
 26
 Horizon's Board resolution approving the 1989 bonuses expressly declared that they were "earned" by Horizon's management team for their services as employees. [8/31/89 Horizon Board Minutes, Receiver Ex. 5].
 
 
 27
 "Employment contract" is not defined in the regulations. However, our interpretation of that term is aided by the following purposes behind the regulatory capital requirements at issue: to ensure the ongoing viability of institutions insured by the Federal Savings and Loan Insurance Corporation, to protect uninsured depositors, to discourage thrift managers from taking excessive risks, and to promote the long-term health of the thrift industry. See 47 Fed.Reg. 52962 (Nov. 24, 1982); 51 Fed.Reg. 16550 (May 5, 1986); 51 Fed.Reg. 33565 (Sept. 22, 1986); 54 Fed.Reg. 46845 (Nov. 8, 1989). Given these purposes, the term must be interpreted broadly enough to subject to regulation all compensation paid for services rendered by employees. This must be the case regardless of the appellation given to the employee compensation. To interpret the term otherwise would allow institutions to avoid regulation merely by changing employee compensation from salary to bonus, and as Judge Burns put it, "promote the very abuses that the regulatory scheme was created to prevent." [Opinion and Order dated January 14, 1993, p. 12]. Gravee and Maher had written contracts providing that they would receive annual bonuses for services they performed, and the bonuses at issue were paid pursuant thereto. Thus the bonuses must be considered "employment contracts" for Section 563.39 purposes. See Crocker v. RTC, 839 F.Supp. 1291, 1295 n. 8 (N.D.Ill.1993) (applying 12 C.F.R. § 563.39 to an agreement providing for payment of a bonus to savings association employee); FSLIC v. Bass, 576 F.Supp. 848, 853 (N.D.Ill.1983) (holding that bonuses payable pursuant to an employment contract were subject to the limitations set forth in 12 C.F.R. § 563.39(a)). Because Cohen did not involve a bonus paid pursuant to written contract, we find it distinguishable and need not express an opinion as to the correctness of its holding.[3]
 
 
 28
 Finally, plaintiffs contend that Judge Burns's determinations are clearly erroneous because they are unsupported by the evidence. Apparently plaintiffs do not regard the detailed testimony of the RTC's expert witness as sufficient: "There is no evidence whatsoever to substantiate [Judge Burns's decision] but the conjecture of RTC 'expert,' John Thoms." [Pl. Br. 12]. They assert that Thoms was unqualified, did not correctly analyze Horizon's financial statements, and failed to take into account certain relevant information in reaching his conclusions. They argue, not surprisingly, that the opposite conclusions of their expert witnesses were much more correct and should have been accepted by the district court instead:
 
 
 29
 "Taken as a whole Peters' testimony at deposition and hearing far outweighs the testimony of Mr. Thoms ... Thoms' faulty reasoning falls far short when weighed against the approximately 150 years of collective training and experience of the five witnesses who testified for the Plaintiffs--all of whom were experts in the field." [Pl. Br. 18-19].
 
 
 30
 The problem with plaintiffs' argument is that these assertions are nothing more than post-verdict attacks on Thoms's credibility. The record is void of any indication that plaintiffs were not given a sufficient opportunity to cross-examine Thoms to attempt to lessen his credibility, or that they were not adequately permitted to elicit information from their expert witnesses to rebut Thoms's opinion. Judge Burns made the following determination: "It is the testimony of RTC's witness John Thoms (along with his written report), when stacked up against the opinions of all the other experts in this case ... that carries the day." [Opinion and Order dated January 14, 1993, p. 7]. As an appellate court, it is simply not our role to second-guess a district court's determination by reweighing the credibility of trial witnesses. Pignato v. American Trans Air, Inc., 14 F.3d 342, 347 (7th Cir.), certiorari denied, --- U.S. ----, 114 S.Ct. 2675, 129 L.Ed.2d 810 (1994).
 
 
 31
 In short, plaintiffs have presented us with nothing to indicate that Judge Burns's determinations were clearly erroneous. The evidence submitted by the RTC is sufficient to support Judge Burns's conclusions that at the time the secular trusts were created, and at the time the 1989 bonuses were paid, it was apparent to Horizon that such expenditures "could lead to material financial loss or damage" to Horizon.
 
 B. Vesting
 
 32
 Plaintiffs argue that because their compensation agreements provided that they became entitled to the proceeds of the trusts prior to the RTC being appointed as Horizon's receiver, and because the 1989 bonuses were paid in full by that time, both the trusts and the bonuses are beyond the RTC's reach. With regard to the bonuses, plaintiffs rely on 12 C.F.R. § 563.39(b)(5), which states in part:
 
 
 33
 (b) Required Provisions. Each employment contract shall provide that:
 
 
 34
 (5) All obligations under the [employment] contract shall be terminated ... at the time ... the association is determined by the Director [of the OTS] to be in an unsafe or unsound condition. Any rights of the parties that have already vested, however, shall not be affected by such action.
 
 
 35
 Plaintiffs additionally claim that Modzelewski v. RTC, 14 F.3d 1374 (9th Cir.1994), supports their assertion that employment contracts which have been fully paid are not reachable by the RTC. In Modzelewski, the Ninth Circuit held that where the RTC terminates an employment contract, the employee's rights under the contract that he is immediately able to claim, i.e., those involving no unfulfilled conditions on his part, are vested and must be honored. However, plaintiffs take Section 563.39 too far. Section 563.39(b) states only that when the OTS terminates valid employment contracts--those that do not violate Section 563.39(a)--it must allow the employee to maintain any rights that have vested prior to that time. That was the situation in Modzelewski. Section 563.39(b) does not address the OTS's ability to void those employment contracts that violate Section 563.39(a) and the Ninth Circuit never reached that question in Modzelewski.
 
 
 36
 To interpret Section 563.39 as plaintiffs suggest would mean that an institution could enter into multiple employee contracts that lead to material financial loss in violation of subsection (a), and everything that it can pay prior to the OTS formally declaring the institution in an unsafe and unsound condition is beyond the reach of the OTS and the thrift's creditors. Such an interpretation would leave the OTS with absolutely no ability to enforce subsection (a), rendering the restrictions of that subsection superfluous. We decline to interpret Section 563.39 in such a manner. Horizon paid Gravee and Maher bonuses that "could lead to a material financial loss" to Horizon. Therefore, the bonuses violated 12 C.F.R. § 563.39(a) and are void. See Aronson v. RTC, 38 F.3d 1110, 1113 (9th Cir.1994) (holding that an agreement that did not comply with Section 563.39(a) was unenforceable); Fleischer v. RTC, 882 F.Supp. 1010, 1014 (D.Kan.1995) (same); Bass, 576 F.Supp. at 853 (same). The fact that Horizon managed to complete the transactions prior to being placed into receivership does not make the bonuses any less violative of Section 563.39(a) and does not make the RTC any less able to reach them.
 
 
 37
 With regard to the trusts, 12 C.F.R. § 563.39-1 contains no language involving the OTS's ability to terminate rights in pension plans, whether vested or not.[4] However, under the same reasoning as we discussed above regarding employment contracts, we decline to interpret Section 563.39-1 in a manner that would leave the OTS powerless to enforce it. Pension plans that, when enacted, "could lead to material financial loss or damage" violate Section 563.39-1 and are therefore void. Cf. Aronson, supra; Bass, supra. Thus the RTC is entitled to retain control of the trust proceeds.
 
 C. Plaintiffs' Post-Judgment Motions
 
 38
 After judgment had been entered and a post-trial hearing held, plaintiffs attempted to amend their complaint to add a claim against the RTC for breach of contract. The district court denied the motion on the ground that it lacked jurisdiction to consider the claim.[5] We agree. The administrative claims process provided by FIRREA requires that an individual who wishes to pursue a claim against a failed institution or its assets, including claims for breach of contract, present that claim to the receiver. 12 U.S.C. § 1821(d)(3)-(5); Capitol Leasing Co. v. FDIC, 999 F.2d 188, 192 (7th Cir.1993). The receiver then has 180 days within which to either allow or disallow the claim. 12 U.S.C. § 1821(d)(5). If the receiver disallows the claim, or refuses to respond within the 180-day period, the claimant is then given 60 days to seek additional administrative review or judicial review in federal district court. 12 U.S.C. § 1821(d)(6)(A). Compliance with the FIRREA process is a strict jurisdictional prerequisite to a claim in federal district court against the receiver. Capitol Leasing, supra. Given that plaintiffs took none of the required steps for administrative relief, the district court properly determined that it was without jurisdiction to hear plaintiffs' breach of contract claim.
 
 
 39
 Additionally, in their motion for a new trial, plaintiffs alleged that one of their expert witnesses, Ronald Friske, had been intimidated by the RTC into not giving testimony as favorable as he had promised. The main gist of plaintiffs' claim is that Friske personally, and Peat Marwick, the accounting firm where he is employed, were sued by the RTC because of negligent professional accounting services related to Horizon. Plaintiffs contend that Friske experienced an "alteration in attitude and testimony [that] was caused by intimidation by attorneys for the RTC." The district court granted plaintiffs the right to reopen the evidence pursuant to Fed.R.Civ.P. 59(a)(2). Judge Burns then considered the testimony given both at depositions and the post-trial hearing of Maher, Gravee, Friske, Thoms, and another of plaintiffs' experts. Judge Burns made the following observations:
 
 
 40
 Mr. Friske's testimony at the hearing and in his deposition do not support [plaintiffs' intimidation] claim. He testified that the suit against him had no effect whatsoever on the testimony he gave at trial in the case before me. I find nothing in Mr. Friske's demeanor or testimony that would call his credibility into question. I find that there is no factual basis to support a finding that Mr. Friske's testimony resulted from or was otherwise affected by intimidation. [Order dated November 23, 1994, p. 3].
 
 
 41
 Judge Burns determined that plaintiffs' intimidation claim was without a factual basis and plaintiffs have not convinced us otherwise.
 
 
 42
 Finally, plaintiffs assert in their reply brief that it was the enactment of FIRREA that caused Horizon to be considered insufficiently capitalized and that FIRREA therefore amounts to a taking of their rights in the trusts in violation of the Fifth Amendment to the Constitution. However, as this argument was not made in their initial brief to this Court, it will not be considered on appeal. Circuit Rule 28(f) ("A reply brief shall be limited to matter in reply."); Paper Exp., Ltd. v. Pfankuch Maschinen GmbH, 972 F.2d 753, 757 (7th Cir.1992) (holding that points raised for the first time in a reply brief are waived); Wilson v. O'Leary, 895 F.2d 378, 384 (7th Cir.1990) ("All arguments for reversal must appear in the opening brief, so that the appellee may address them. [This Court has] consistently refused to consider arguments withheld until the reply.").
 
 Conclusion
 
 43
 The regulations at issue were enacted to deter precisely the activities that occurred here: an institution paying compensation bonuses and arranging deferred compensation plans for its employees at a time when it could ill afford to do so. These transactions are prohibited by 12 C.F.R. §§ 563.39-1 and 563.39 and are therefore void. However, we wish to note that our holding does not suggest that plaintiffs have no vested contractual rights to their deferred compensation. It means only that the property interests plaintiffs acquired as a result of the trusts are void and that the trust assets will be shared by all persons with proper claims against Horizon.
 
 
 44
 Judgment affirmed.
 
 
 
 *
 Judge Burns is a senior district judge from the District of Oregon sitting below by designation
 
 
 **
 The Honorable Donald P. Lay, Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation
 
 
 [1]
 September 1, 1988 was the first day of Horizon's fiscal 1989
 
 
 [2]
 Plaintiffs also attempt to argue that the trusts were "created" when money was allocated to the rabbi trusts in 1987, not when those funds were placed into the secular trusts. However, as the district court properly noted, "as a matter of definition as well as economic reality, it is clear that the funds in the rabbi trusts remained assets of Horizon, while the funds, once placed in the secular trusts, became assets of the individual plaintiffs and were no longer available to Horizon or its general creditors." [Memorandum and Opinion dated January 14, 1995, p. 10]. We agree with the district court that the date when the assets were removed from the reach of Horizon's creditors is the date relevant to our inquiry
 
 
 [3]
 The same day that the district court in Cohen issued the order discussed above, it released a separate order granting the RTC summary judgment in a dispute regarding the bonus of another plaintiff in the case, Rozells. Cohen v. RTC, No. CIV. 90-1065-R(P), 1993 WL 282051 (S.D.Cal., May 10, 1993). Rozells had a written contract which provided that if he was still employed on a certain date, he would receive a "retention bonus." The district court concluded that this bonus was an "employment contract" for Section 563.39 purposes. Id. at * 2
 
 
 [4]
 The regulation does contain a "termination" provision that permits the plan's board of directors or its successors to cease contributing to a plan with 60 days' notice to the District Director of the OTS. 12 C.F.R. § 563.39-1(d)
 
 
 [5]
 The district court also denied the motion on the alternate ground that the motion was untimely. Because we agree that the district court lacked jurisdiction to hear the breach of contract claim, we express no opinion as to the timeliness of the motion