**RESOLUTION TRUST CORPORATION,** as Conservator for Columbia Banking Federal Savings and Loan Association, Plaintiff–Appellee,

v.

**William B. MACKENZIE and Ronald H. Timms, Defendants–Appellants.**

**Nos. 738, 798, Dockets 94–7674, 94–7684.**

United States Court of Appeals, Second Circuit.

Argued Jan. 11, 1995.

Decided July 24, 1995.

973

MacKenzie originally brought suit in state court against Norstar seeking disbursement of his share of the Plan assets on July 19, 1991. MacKenzie alleged that Norstar had breached its fiduciary duties and contractual obligations as Trustee of the Plan assets in failing to disburse MacKenzie's share of those assets upon his request. Norstar commenced an interpleader action by way of a counterclaim against MacKenzie and a third-party complaint against RTC and Timms as well as several other potential beneficiaries of Columbia's executive compensation plans. Timms and RTC filed answers to Norstar's third-party complaint. On November 6, 1992, RTC removed the case to the United States District Court for the Western District of New York pursuant to 12 U.S.C. § 1819(b)(2)(B). RTC further asserted several counterclaims and cross-claims against Norstar, MacKenzie and Timms. At the conclusion of discovery, Timms, MacKenzie and RTC each moved for summary judgment.

On October 18, 1993, Judge Larimer issued a Decision and Order granting RTC's motion for partial summary judgment, denying Mac-Kenzie's and Timms' respective motions for summary judgment, and directing Norstar to transfer the Plan assets to RTC. Timms and MacKenzie seek to have the District Court ruling reversed and an order granting their respective motions for summary judgment entered by this court.

■ Summary judgment is appropriate where the record, as a whole, shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). We review a district court's grant of summary judgment de novo, viewing the evidence "in a light most favorable to ... the non-moving party, and draw[ing] all reasonable inferences in his favor." *Aslanidis v. United States Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir.1993).

### Background

The material facts in this matter are undisputed. In 1985, Columbia's Board of Directors created two deferred executive compensation plans, the Golden Retention Plan and Executives' Deferred Compensation

---

Fred G. Aten, Jr., Rochester, NY (Harter, Secrest & Emery, Rochester, NY), for plaintiff-appellee.

William G. Bauer, Rochester, NY (Woods, Oviatt, Gilman, Sturman & Clarke, Rochester, NY), for defendant-appellant William B. MacKenzie.

Jeffrey M. Wilkens, Rochester, NY (Osborn, Reed, Burke & Tobin, Rochester, NY), for defendant-appellant Ronald H. Timms.

Before: KEARSE, McLAUGHLIN and PARKER, Circuit Judges.

PARKER, Circuit Judge:

This case concerns an interpleader action brought by Norstar Trust Company ("Norstar") to determine the ownership of certain assets it held as a third-party trustee. The assets in question are funds deposited as part of two deferred executive compensation plans ("Plan assets") by Columbia Banking Federal Savings and Loan Association ("Columbia") for several of its executives. Two former Columbia executives, William B. MacKenzie, formerly President and Chief Executive Officer of Columbia ("MacKenzie"), and Ronald H. Timms, former Senior Vice President of Columbia ("Timms"), seek payment from the Plan assets under the terms of Norstar's trust agreement with Columbia. The Resolution Trust Corporation ("RTC"), in its role as successor to and Receiver for Columbia, seeks possession of the Plan assets to resolve claims by Columbia's creditors.

Plan. Under the Golden Retention Plan, covered employees were assigned "minimum target benefits" in addition to their regular annual salaries, and periodic contributions were made on behalf of each covered employee into their individual accounts ("Plan accounts") within the Golden Retention Plan asset corpus. These contributions were scheduled to reach the minimum target benefits for each covered employee over a period of ten years. MacKenzie's minimum target benefit was set at $1,000,000 and Timms' at $500,000.

The Executives' Deferred Compensation Plan merely provided Columbia executives the option of electing to defer receipt of a portion of their regular annual salaries, presumably for tax purposes. Like the Golden Retention Plan, the Executives' Deferred Compensation Plan also maintained all Plan assets in a single asset corpus. However, for bookkeeping purposes, each individual's share of that corpus was described as a separate Plan "account".

To maximize employee compensation, both the Golden Retention Plan and the Executives' Deferred Compensation Plan (collectively "the Plans") were structured consistent with having their Plan assets deposited in irrevocable grantor trusts. In this instance, Columbia deposited the assets from the two Plans in two grantor trusts, created on the same day through two identical grantor trust agreements (collectively "the Grantor Trust Agreement"), to be administered by Norstar.

Grantor trusts confer favorable tax treatment to the trust grantee—in this case the covered employees—by maintaining the trust as an asset of the employer at all times during its existence. 26 U.S.C. § 671. As such, the employer pays whatever taxes are due on any income generated by the trust and all post-tax income accrues to the trust for the employee's benefit. In this way, the employee defers individual tax liability on his allocated share of the trust assets while trust income accrues.

However, because the trust assets are considered assets of the employer, they remain available to the employer's general creditors in the event of insolvency. Both Plans and the Grantor Trust Agreement state this fact.

Section 9 of the Golden Retention Plan provides:

Notwithstanding the creation of the trust ... the contributions of [Columbia], and earnings thereof, irrespective of their allocation to the Employee's Account, shall at all times remain subject to the claims of the general creditors of [Columbia], should such disposition be directed by a court of competent jurisdiction.

Section 4(B) of the Executives' Deferred Compensation Plan provides:

[Columbia's] obligation to pay the Participant Compensation deferred under the Plan is and shall at all times remain a general unsecured obligation of [Columbia]. Title and beneficial ownership of any assets, whether cash or investments, contained in the Deferred Compensation Account is and shall at all times remain in [Columbia]. The Participant and/or his designated beneficiary will not have any property interest in such assets.

Similarly, Section 2.8 of the Grantor Trust Agreement entered into by Columbia and Norstar provides for the protection of Columbia's general creditors at the potential expense of the covered employees in the event of Columbia's insolvency:

The Chief Executive Officer and the entire Board of Directors shall advise the Trustee as soon as administratively practicable of any event or condition that portends [Columbia's] impending bankruptcy or insolvency (i.e., [Columbia's] inability to meet its current obligations). Immediately upon receipt of such notice, the Trustee shall cease all benefit payments to [covered employees] and beneficiaries and shall thereafter distribute Trust Fund assets only in accordance with judicial direction. Upon [Columbia's] bankruptcy or insolvency, the rights of [covered employees] and beneficiaries to Trust assets shall not be any greater ... than the rights of [Columbia]. In the event of [Columbia's] bankruptcy or insolvency the Trust's assets shall be subject to the claims of [Columbia's] creditors. Nothing in this Section specifically, or the Agreement generally, shall give [Columbia's] creditors any

claim against Trust Fund assets prior to [Columbia's] bankruptcy or insolvency.

Under both Plans, an employee's share of the Plan assets was to be disbursed upon that employee's death, disability or termination. In the event of death or disability, the Golden Retention Plan provided that the employee, or his or her beneficiary, would receive 100% of the amount credited to the employee's Plan account at that time. Similarly, if an employee stopped working for Columbia more than five years after commencement of a Golden Retention Plan account for that employee, he or she would receive 100% of the amount credited to his or her Plan account at that time, subject to certain exclusions if the termination was involuntary. However, if an employee stopped working for Columbia prior to the five-year anniversary of commencement of his or her Golden Retention Plan account, that employee would not be entitled to any of the Plan assets. Because the Executives' Deferred Compensation Plan deferred salary income which had already been earned, that Plan made no distinction between voluntary termination, involuntary termination and death, nor did it require a specific period of service prior to disbursement.

Columbia's Board of Directors created both Plans in December 1985. The Golden Retention Plan Agreement designated January 1, 1986 as the commencement date of Golden Retention Plan accounts for both MacKenzie and Timms. On March 13, 1989 Columbia's Board of Directors voted to transfer the Plan assets, under both the Golden Retention Plan and the Executives' Deferred Compensation Plan to a third-party trustee. On September 28, 1989, the Grantor Trust Agreement was executed between Columbia and Norstar. On January 1, 1991, while still employed by Columbia, both MacKenzie and Timms reached their five-year anniversary of commencement under the Golden Retention Plan. Therefore, according to the terms of the Golden Retention Plan, both MacKenzie and Timms were entitled to 100% of the amount credited to their respective Plan accounts, upon death, disability, or termination.

Meanwhile, the Office of Thrift Supervision ("OTS"), the federal regulatory agency responsible for supervising savings and loan business practices, initiated a thorough investigation of Columbia's lending and accounting practices. While the record is less than comprehensive regarding the progressive deterioration of Columbia's financial status, it is apparent that, as early as July 1990, OTS found it necessary to impose restrictions on Columbia's lending practices.

On July 31, 1990, Columbia submitted a "capital plan" for OTS approval proposing a schedule for increasing Columbia's capital reserves in response to Columbia's precarious loan exposure. On January 23, 1991, Columbia notified OTS that it was unable to marshal sufficient funds to remain in compliance with its capital plan. Failure to comply with an OTS-approved capital plan is defined, at 12 U.S.C. § 1464(t)(6)(E), as an "unsafe and unsound" financial condition. Under 12 U.S.C. § 1821(c)(5)(C), an "unsafe and unsound condition" is grounds for appointing a conservator or receiver. *See also* 12 U.S.C. § 1821(c)(5)(K)(iv) (failure by an undercapitalized lending institution to maintain a capital restoration plan as grounds for placing institution in conservatorship or receivership).

As a result of its review of Columbia's financial records, the OTS issued a Federal Regular (Safety and Soundness) Examination Report, mailed to Columbia's Board of Directors on May 30, 1991. This report assigned Columbia a composite rating of "5," which the report's cover letter states, "is reserved for institutions with an extremely high immediate or near-term probability of failure." The Report's conclusions are equally gloomy:

> Columbia has very serious problems, with a significant deterioration in asset quality, poor management, and ineffective board oversight *resulting in the institution being capital insolvent at report date.* Inadequate loan loss reserves and the need for additional general valuation allowances have led to a significant decline in [Columbia's] earnings performance, and it is unlikely [Columbia] will achieve capital com-

pliance without Federal assistance and/or a merger/acquisition.

(Emphasis added.) The report elsewhere concluded that Columbia was capital insolvent as of December 31, 1990.

In a letter dated March 8, 1991, Columbia was ordered to submit all disbursements under the Golden Retention Plan "for prior OTS review and nonobjection."

On April 1, 1991, Timms resigned from his position with Columbia. On April 5th, Timms made a written demand to Columbia for payment of the funds in his Golden Retention Plan account. MacKenzie resigned on April 30, 1991, effective May 1st. MacKenzie demanded disbursement of the funds credited to both his Golden Retention Plan account and his Executives' Deferred Compensation Plan account directly from Norstar in a letter dated July 17, 1991.[1] MacKenzie filed the suit giving rise to this appeal the following day. Timms claims he is due $338,-895.54 and MacKenzie claims he is owed $852,229.76.

On May 6, 1991, the Columbia Board of Directors notified Norstar, pursuant to Section 2.8 of their Grantor Trust Agreement, to "cease all benefit payments until further notice." ("The May 6th Letter.") As a result, Norstar never disbursed any of the Plan assets to either Timms or MacKenzie.

On June 10, 1991, OTS and Columbia entered into a consent agreement giving OTS complete supervisory authority over every significant business decision made by Columbia. This consent agreement also acknowledged that Columbia's financial status warranted conservatorship and/or receivership. Thus, Columbia agreed not to contest appointment of a Conservator or Receiver should OTS deem it necessary. On June 11, 1992, OTS placed Columbia in receivership under the authority of RTC.

*Discussion*

RTC does not dispute that Timms and MacKenzie (henceforward "Claimants") remained employed by Columbia for a sufficient period of time to qualify for 100% of the amount credited to their Plan accounts. Nor does RTC dispute that Section 5(A) of the Golden Retention Plan Agreement provides for Claimants to have received the balance of their Golden Retention Plan accounts in a lump sum as of the date of their termination.[2] Indeed, RTC concedes, for the purpose of argument, that Claimants' rights to the Plan assets were superior to any rights of Columbia prior to the Consent Agreement of June 11, 1992 which appointed RTC as Receiver for Columbia. Instead, RTC maintains that Claimants' rights prior to June 11, 1992 are irrelevant to this appeal. We agree.

RTC urges us to follow four other courts which have held that RTC has a superior right to grantor trust assets for the purposes of liquidation. *See Curtin v. Raab*, 1993 WL 106901 (E.D.Pa.), *aff'd*, 14 F.3d 46 (3d Cir. 1993); *Goodman v. Resolution Trust Corp.*, 7 F.3d 1123 (4th Cir.1993); *Nationsbank of Georgia, N.A. v. Resolution Trust Corp.*, No. 3:92–0546 (M.D.Tenn. Mar. 8, 1994); and *Northwestern Mutual Life Ins. Co. v. Resolution Trust Corp.*, 848 F.Supp. 1515 (N.D.Ala.1994). However, while each of these cases indeed holds that RTC, as receiver, has a superior right to grantor trust assets, all four cases concern grantee claims brought after RTC had been appointed receiver. Therefore, none of the four cases reach the precise issue before us: Does the RTC have a superior right to grantor trust assets where a grantee's claim to those assets was made prior to receivership? We do not hesitate to find that RTC has such a right.

 Assets held in a grantor trust are considered the property of the grantor. Section 671 of the Internal Revenue Code treats the grantor as the owner of the trust assets, thus making the trust assets taxable to the

---

1. The record and briefing are unclear as to whether Timms caused any compensation to be deferred under the Executives' Deferred Compensation Plan. This is of no significance since the analysis is the same regarding either Plan.

2. Of course, the Executives' Deferred Compensation Plan would permit participants to receive disbursement from the Plan accounts prior to termination if they should so choose.

grantor, until those trust assets are distributed to the grantee. Therefore, under the tax code, it is the act of distribution which conveys the assets held in a grantor trust from the grantor to the grantee. *See Mertens Law of Federal Income Taxation* § 25B.212 (1988); IRS Rev.Proc. 92–64, 1992–2 C.B. 422.

In a similar fashion, Section 9 of the Golden Retention Plan Agreement provides that, irrespective of their allocation to a particular employee's account, the Plan assets "shall at all times remain subject to the claims of the general creditors of [Columbia]...." This language clearly implies that the Plan assets remain subject to the claims of the grantor's general creditors so long as the Plan assets remain in the trust corpus. Section 4(B) of the Executives' Deferred Compensation Plan Agreement makes this implication explicit.

> Title and beneficial ownership of any assets, whether cash or investments, contained in the Deferred Compensation Account is and shall at all times remain in [Columbia]. The Participant and/or his designated beneficiary will not have any property interest in such assets.

Therefore, we hold that, at all times relevant to this case the Plan assets remained the property of Columbia, subject to the claims of its creditors. MacKenzie and Timms are merely two such creditors.

> In reality, the recipient receives only the company's unsecured promise to pay benefits and has no rights against any assets other than the rights of a general unsecured creditor of the company.... The employer will be treated as the owner of the trust....

*Mertens* § 25B.212. At the time the Claimants made their demand for payment, they were merely general unsecured creditors of Columbia. Rightly or wrongly, the Plan assets remained in the grantor trust held by Norstar, thus Columbia's property, at the time RTC was appointed Receiver for Columbia. This fact is itself dispositive of Norstar's interpleader claim. This result is also consistent with the RTC's statutory authority as Receiver.

The RTC's authority as Receiver or Conservator is defined in the 1989 Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), the relevant sections codified as amendments to 12 U.S.C. § 1821. While this section refers generally to the powers and duties of the Federal Deposit Insurance Corporation ("FDIC"), 12 U.S.C. § 1441a(b)(4)(A), extends these powers and duties to RTC as well.

■ Once appointed Receiver, RTC succeeds to all rights and privileges of the insolvent institution. 12 U.S.C. § 1821(d)(2)(A). Therefore, all claims against the failed institution become claims against RTC as Receiver and such claims are governed by federal law. 12 U.S.C. § 1819(b)(2)(A). As Receiver, RTC is authorized to realize upon the assets of the institution in receivership for the purposes of liquidation or other appropriate resolution. 12 U.S.C. § 1821(d)(2)(E). In doing so, RTC is obligated to protect the creditors and depositors of the institution. 12 U.S.C. § 1821(d)(11)(A).

■ RTC's authority to realize upon the assets of a failed institution, combined with its duty to protect creditors and depositors of that institution, supersedes, though it does not extinguish, any claim pending against the institution, or in this case, the institution's assets at the time RTC is appointed Receiver. While the starkness of such a conclusion is not lost on this court, its validity is well established in both this Circuit and others. *See, e.g., Resolution Trust Corp. v. Elman,* 949 F.2d 624, 627 (2d Cir.1991) (state law rights under attorney's retaining lien superseded by RTC's powers under FIRREA once appointed receiver). *See also Bueford v. Resolution Trust Corp.,* 991 F.2d 481, 484 (8th Cir.1993) (employment discrimination claim pending before district court at time RTC appointed receiver for defendant lending institution becomes suit against RTC and plaintiff required to exhaust administrative remedies under FIRREA as jurisdictional prerequisite to further pursuing suit in district court); *Downriver Comm. Fed. Credit U. v. Penn Square Bank,* 879 F.2d 754, 758–61 (10th Cir.1989) (where bank fraudulently induced deposits, remedy nevertheless governed by federal law favoring equal distribution among all general creditors, rather than

any equitable right under state law, once defendant bank placed in receivership), *cert. denied,* 493 U.S. 1070, 110 S.Ct. 1112, 107 L.Ed.2d 1019 (1990).

Here RTC seeks, under its own statutory authority, to realize upon the Plan assets for the satisfaction of Columbia's creditors. The grantor trust structure of the two Plan Agreements expressly provides for the disposition of the Plan assets in this manner. The fact that the Plan assets remained in the trust corpus, thus in the possession of Columbia, at the time RTC was appointed Receiver alone compels our holding that RTC has a superior right to the Plan assets at this time. Once Columbia became insolvent and went into receivership, Claimants lost any right to the particular Plan assets held in trust by Norstar.

■ For these reasons, Norstar's interpleader action must be resolved in favor of RTC. Regardless of the fate of the actual Plan assets, however, the underlying obligation to compensate Claimants pursuant to the Plan Agreement is undisturbed by this inquiry. Indeed, that obligation is unchallenged at this time. Claimants are simply unsecured creditors of Columbia and must pursue their claims through those channels available to Columbia's other unsecured creditors.

■ There remain Claimants' allegations that Norstar breached its contractual and fiduciary duties as Trustee of the Plan assets by failing to disburse the balance of Claimants' individual Plan accounts upon Claimants' requests. A brief review of the undisputed facts in this matter shows that these claims also fail.

Timms resigned effective April 1, 1991 and, on April 5th, submitted a letter to Columbia seeking disbursement of his Plan account balance. It does not appear that Norstar had notice of his request prior to Columbia's May 6th letter ordering Norstar to withhold disbursement of Plan assets pursuant to Section 2.8 of the Grantor Trust Agreement. Once the May 6th letter issued, Norstar had no legal authority to disburse the Plan assets under the terms of the Grantor Trust Agreement. Therefore,

Timms has simply failed to show that Norstar breached any duty to him. Similarly, although MacKenzie resigned effective May 1, 1991, his request for disbursement by Norstar was dated July 17, 1991. As stated above, Norstar lacked the legal authority to disburse Plan assets under the Grantor Trust Agreement after May 6, 1991. Therefore, Timms' and MacKenzie's claims that Norstar breached its fiduciary duties and contractual obligations as Plan Trustee are unfounded.

### *Conclusion*

For the foregoing reasons, we affirm the district court's judgment.