**In the Matter of the Interpleader Between WESTPORT BANK & TRUST COMPANY, Plaintiff,**

v.

**M. James GERAGHTY and Norman M. Steere, Defendants–Cross–Claimants–Appellants,**

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION, Defendant–Cross–Defendant–Appellee.**

No. 593, Docket 95–6101.

United States Court of Appeals, Second Circuit.

Argued Dec. 20, 1995.

Decided July 25, 1996.

Evan M. Tager, Washington, D.C. (Andrew L. Frey, Mayer, Brown & Platt, Washington, D.C., of counsel), for Defendants–Cross–Claimants–Appellants.

Maria Beatrice Valdez, Federal Deposit Insurance Corporation, Washington, D.C. (Ann S. DuRoss, Assistant General Counsel, Colleen B. Bombardier, Senior Counsel, Jaclyn C. Taner, Counsel, Federal Deposit Insurance Corporation, Washington, D.C., of counsel), for Defendant–Cross–Defendant–Appellee.

Before: MAHONEY, LEVAL, and CABRANES, Circuit Judges.

MAHONEY, Circuit Judge:

This is an interpleader action brought by plaintiff Westport Bank & Trust Company ("Westport") against defendant-cross-defendant-appellee the Federal Deposit Insurance Corporation (the "FDIC") and defendants-cross-claimants-appellants Norman M. Steere and M. James Geraghty (collectively

"Appellants"), the competing claimants to the corpora of three trusts that Westport served as trustee. The United States District Court for the District of Connecticut, Warren W. Eginton, *Judge,* granted the FDIC's motion for summary judgment on its claims to the corpora of the three trusts, denied Appellants' motions for summary judgment, and entered a corrected final judgment in favor of the FDIC on June 15, 1995.

We affirm the judgment of the district court.

## Background

This action arises out of the failure of Citytrust, a state chartered, federally insured depository institution located in Bridgeport, Connecticut. In 1990, Citytrust qualified as a lending institution in a "troubled condition" within the meaning of § 32(a)(3) of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub.L. No. 101–73, § 32(a)(3), 103 Stat. 183, 484 (1989) (codified at 12 U.S.C. § 1831i(a)(3)).[1] As a result, a Memorandum of Understanding dated October 17, 1990 (the "MOU") was entered into between the Board of Directors of Citytrust, the Regional Director of the FDIC, and the Banking Commissioner of the State of Connecticut (the "Commissioner") that imposed various requirements upon Citytrust to "address[ ] the financial and administrative deficiencies cited in [a] Report of Examination dated February 23, 1990." One such requirement was that Citytrust retain "management acceptable to the Regional Director and the Commissioner," including "a qualified individual to assume the duties of president."

Pursuant to the MOU, Citytrust undertook a search for a new president. Steere, who had retired in 1987 as vice chairman and a director of Mellon Bank Corporation and its subsidiary, Mellon Bank, N.A., soon became the leading candidate for the position, and Citytrust entered into negotiations with him. Steere made it clear that he would accept the position, which required him to relocate to Connecticut, only if he was provided adequate insurance against, *inter alia,* the possibility that Citytrust would terminate him before his employment contract expired. Citytrust then developed, in consultation with the FDIC, an arrangement whereby two separate trusts, each funded by $350,000, would be established as additional security for Steere in the event that Citytrust did not remit to him the severance benefits to which he would be entitled under his proposed employment agreement, which provided for Steere's employment as president and chief executive officer of Citytrust from November 5, 1990 to December 31, 1992, and for extension by mutual agreement for two additional two-year periods. When these trusts were subsequently established, Westport was designated trustee of both of them.

Paragraph 13(a) of the employment agreement provided that if Steere terminated the agreement because of an uncured default by Citytrust, Steere would be entitled to receive his annual base salary for the remainder of the agreement (i.e., to December 31, 1992) in a lump sum within thirty days of termination. Paragraph 13(e) provided that if Citytrust terminated the agreement other than for cause, Steere would be entitled to one year's salary in a lump sum within thirty days of termination. Steere's base salary was $350,000 per annum, and was to increase to $400,000 per annum on January 1, 1992.

The first of the Steere trusts was denominated a "secular" trust. The trust agreement provided that "[t]he principal of the Trust and any earnings thereon shall be held separate and apart from other funds of [Citytrust] and shall be used exclusively for the

1. Section 1831i(a) requires thirty days prior notice to the FDIC by "[a]n insured depository institution or depository institution holding company" with respect to "the proposed addition of any individual to [its] board of directors or the employment of any individual as a senior executive officer" if, *inter alia,* it is "in a troubled condition." Section 1831i(b) authorizes the FDIC to disapprove such addition or employ-

ment within the thirty-day period. Section 1831i(f) states that "[e]ach appropriate Federal banking agency shall prescribe by regulation a definition for the term[ ] 'troubled condition' ... for purposes of subsection (a) of [§ 1831i]." At least as of the time of the events at issue in this case, however, no such regulation had been promulgated by the FDIC.

uses and purposes ... set forth [in the trust agreement]," and that "the Trust shall be irrevocable and may not be amended or terminated by [Citytrust] in whole or in part," subject to immaterial exceptions and to provisions allowing the trust to be terminated and its assets returned to Citytrust if the purposes of the Trust had been fully satisfied and Steere was "no longer entitled to benefits" thereunder. The trust agreement further specified that "[t]he Trust shall not be subject to the claims of creditors of [Citytrust] in a receivership, bankruptcy or other insolvency proceeding under federal or state law, but shall be maintained for the exclusive purpose of providing benefits to [Steere]." As beneficiary of this trust, Steere was entitled to payment

> in the event that [his] employment is terminated under paragraph 13(a) of the Contract, "Termination for Good Reason" or under paragraph 13(e) ... [,] "Termination for Other th[a]n Cause[,]" and the base salary specified in said paragraphs is not paid by [Citytrust] in a lump sum within thirty (30) days of the effective date of such termination of employment (as defined in said paragraphs).

The secular trust agreement also states that the trust "is a funded Trust and, as such, it is intended that [Steere] be taxed in accordance with [I.R.C. §] 402(b) and [that Citytrust] shall be entitled to a deduction for payments to the Trust in accordance with [I.R.C. §] 404(a)(5)." Section 402(b)(1) provides in pertinent part:

> Contributions to an employees' trust made by an employer ... shall be included in the gross income of the employee in accordance with section 83 (relating to property transferred in connection with performance of services), except that the value of the employee's interest in the trust shall be substituted for the fair market value of the property for purposes of applying such section.

I.R.C. § 402(b)(1). Section 402(b)(3) provides, however, that a beneficiary of such a trust "shall not be considered the owner of any portion [thereof]." Steere's trust agreement specifies that the secular trust "is intended to be a trust of which [Citytrust] is

treated as the owner for federal income tax purposes in accordance with [I.R.C. §§ 671–679]." Generally speaking, this means that aside from the tax treatment of the original contribution to the trust, which is governed by I.R.C. §§ 402(b) and 404(a)(5) as just described, there would be "included in computing the taxable income and credits of [Citytrust] those items of income, deductions, and credits against tax [generated by] the trust." I.R.C. § 671; *see also Resolution Trust Corp. v. MacKenzie,* 60 F.3d 972, 974 (2d Cir.1995).

The second trust created for Steere was denominated a "rabbi" trust. Its terms correspond to those of Steere's secular trust in all but two respects. First, although specifying that Citytrust would be the owner of the rabbi trust for purposes of §§ 671–679, the rabbi trust agreement contained no provision for Steere to be taxed in accordance with § 402(b). Second, the rabbi trust agreement explicitly provided that the trust's assets would be subject to the claims of Citytrust's creditors at all times, and that in the event of Citytrust's insolvency, defined to include the appointment of a receiver "with respect to [Citytrust], by a State or Federal regulatory agency," the Trustee would "deliver any undistributed principal and income in the Trust to satisfy such claims as a court of competent jurisdiction may direct." Both trusts, however, were designed to secure Steere's rights to severance benefits under ¶¶ 13(a) and 13(e) of his employment agreement.

As previously stated, the FDIC was apprised on a continuing basis concerning the formulation of Steere's employment agreement and related trust agreements, and approved Steere's employment by Citytrust after the final agreements were provided to the FDIC. Accordingly, Steere and Citytrust executed the employment agreement on December 5, 1990, effective as of November 5, 1990, Steere's first day at work for Citytrust. Execution of the trust agreements was completed on December 6, 1990.

When Citytrust and the FDIC entered into the MOU, Geraghty had been employed by Citytrust for twenty-one years and was then its senior executive vice president in charge of the special asset management division.

Citytrust received the FDIC's approval of Geraghty as a member of Citytrust management, as required by the MOU. However, in view of Citytrust's troubled financial condition and prospects for gainful employment elsewhere, Geraghty informed the chairman of Citytrust's board of directors that he would resign his position unless Citytrust could provide him with further job security. Citytrust responded by proposing an arrangement similar to Steere's: Geraghty's employment agreement would provide for appropriate severance payments, and a secular trust would be established in the amount of $185,000 to secure those payments. When this trust was subsequently established, Westport was designated its trustee.

The secular trust created for Geraghty corresponds to Steere's secular trust in all material respects. It secured the compensation to which Geraghty would be entitled under ¶¶ 12(a), 12(d) and 12(e) of his employment agreement, which provided for Geraghty's continued employment as senior vice president in charge of Citytrust's special asset management division from December 7, 1990 to December 31, 1992, subject to an option for Citytrust to renew the contract for an additional two-year period. Paragraph 12(a) provided that if Geraghty terminated his employment agreement because of an uncured default by Citytrust, he would be entitled to two years base salary in a lump sum within thirty days of termination. Paragraph 12(e) provided the same payout to Geraghty in the event that Citytrust terminated his employment other than for cause, or declined to renew his contract after its expiration on December 31, 1992. Paragraph 12(d) provided for a reduced severance payment in the event of a termination initiated by Citytrust or (subject to certain conditions) Geraghty after the expiration of the employment agreement (including the optional two-year renewal term). Geraghty's base salary under the employment agreement was $160,000. Geraghty's employment agreement became effective as of December 7, 1990, and the trust agreement was executed on December 24, 1990.

Notwithstanding the efforts of Steere and Geraghty, Citytrust's financial condition continued to decline. On August 9, 1991, the bank was declared insolvent by the Commissioner. Citytrust was closed and the FDIC was appointed receiver on the same day. On August 12, 1991, the FDIC informed Westport that it was disaffirming the trust agreements of both Steere and Geraghty pursuant to its authority under 12 U.S.C. § 1821(e)(1) to disaffirm burdensome contracts,[2] and di-

---

**2.** Section 1821(e) provides in pertinent part:

**(1) Authority to repudiate contracts**

In addition to any other rights a conservator or receiver may have, the conservator or receiver for any insured depository institution may disaffirm or repudiate any contract or lease—

(A) to which such institution is a party;

(B) the performance of which the conservator or receiver, in the conservator's or receiver's discretion, determines to be burdensome; and

(C) the disaffirmance or repudiation of which the conservator or receiver determines, in the conservator's or receiver's discretion, will promote the orderly administration of the institution's affairs.

. . . .

**(3) Claims for damages for repudiation**

**(A) In general**

. . . [The] liability of the conservator or receiver for the disaffirmance or repudiation of any contract pursuant to paragraph (1) shall be—

(i) limited to actual direct compensatory damages; and

(ii) determined as of—

(I) the date of the appointment of the conservator or receiver. . . .

**(B) No liability for other damages**

For purposes of subparagraph (A), the term "actual direct compensatory damages" does not include—

(i) punitive or exemplary damages;

(ii) damages for lost profits or opportunity; or

(iii) damages for pain and suffering.

. . . .

**(7) Provisions applicable to service contracts**

**(A) Services performed before appointment**

In the case of any contract for services between any person and any insured depository institution for which the [FDIC] has been appointed conservator or receiver, any claim of such person for services performed before the appointment of the conservator or the receiver shall be—

(i) a claim to be paid in accordance with subsections (d) and (i) of this section [providing generally for assertion of claims by general creditors]; and

(ii) deemed to have arisen as of the date the conservator or receiver was appointed.

rected Westport to freeze the trust accounts and remit the assets to the FDIC as receiver. The FDIC then informed Steere and Geraghty by letters dated August 21, 1991 that it was disaffirming their employment and trust agreements, and advised them of their right to file a claim against the receivership estate.

The actual dates of Appellants' respective terminations as employees of Citytrust are not entirely clear from this record. In a Statement of Material Facts Not at Issue, the FDIC acknowledged that "[o]n or about August 9, 1991, Geraghty was notified that his employment with Citytrust was terminated," and that "[h]is termination was not 'for cause' within the meaning of his Employment Agreement." However, Geraghty stated in an October 8, 1991 letter to Westport (in which he claimed the right to the $185,000 in his trust) that Citytrust "ha[d] terminated [his] employment under paragraph 12 of the Employment Agreement pursuant to certain correspondence dated August 21, 1991. . . ." After filing this claim with Westport, Geraghty brought administrative claims against the FDIC as receiver for Citytrust arising from the FDIC's disaffirmance of his employment and trust agreements, which the FDIC disallowed.

As for Steere, the record indicates that on August 6, 1991, three days before Citytrust was declared insolvent, Citytrust's board of directors prospectively released him from a noncompetition clause in his employment agreement in the event of Citytrust's insolvency. On August 28, 1991, the board resolved to discharge Steere other than for cause, although Steere's final salary check compensated him through September 6, 1991. In an October 7, 1991 letter to Westport requesting compensation from his trusts for salary unpaid by Citytrust from September 9, 1991 to December 31, 1991, Steere acknowledged that he had been terminated as an employee other than for cause on August 28, 1991, and that he had resigned as a director the following day. The FDIC does not state when it believes Steere was terminated, but recognizes that around August 30, 1991, Steere notified Westport of his termination by Citytrust and his intention to seek compensation under his employment agreement and trust agreements. Steere filed administrative claims against the FDIC as receiver for Citytrust in September 1991 based upon these repudiated agreements, and those claims were denied by the FDIC.

In view of the conflicting claims to these trust funds made by the FDIC and Appellants, Westport filed this interpleader action on November 14, 1991 pursuant to Rule 22 of the Federal Rules of Civil Procedure, seeking a ruling on the appropriate disposition of all assets in the three trusts. Westport was granted an interlocutory judgment of interpleader effectively dismissing it from the case, and the FDIC and appellants then filed cross-motions for summary judgment, each claiming entitlement to the funds in the trusts.

The motions were presented to Magistrate Judge F. Owen Eagan, who issued an Amended Recommended Ruling granting summary judgment to the FDIC and dismissing appellants' motions on June 24, 1994. Magistrate Judge Eagan concluded that 12 U.S.C. § 1828(k) (a provision that was added by § 2523(a) of the Crime Control Act of 1990, Pub.L. No. 101–647, § 2523(a), 104 Stat. 4789, 4868 (1990), and empowers the FDIC to regulate or prohibit golden parachute payments or indemnification payments to institution-affiliated parties)[3] authorized

---

**(B) Services performed after appointment and prior to repudiation**
If, in the case of any contract for services described in subparagraph (A), the conservator or receiver accepts performance by the other person before the conservator or receiver makes any determination to exercise the right of repudiation of such contract under this section—
(i) the other party shall be paid under the terms of the contract for the services performed; and

(ii) the amount of such payment shall be treated as an administrative expense of the conservatorship or receivership.

3. Section 1828(k) provides in pertinent part:
**(1) Golden parachutes and indemnification payments**
The [FDIC] may prohibit or limit, by regulation or order, any golden parachute payment or indemnification payment.
**(2) Factors to be taken into account**
The Corporation shall prescribe, by regulation, the factors to be considered by the [FDIC] in

the FDIC to disallow payment under these trusts because the trusts effectively operated as § 1828(k) golden parachute payments. He added that this ruling was "consistent with the conclusions to which other courts have come when construing the FDIC's authority under 12 U.S.C. § 1821(e)."

On September 29, 1994, Judge Eginton adopted, ratified, and affirmed Magistrate Judge Eagan's recommended ruling by a summary endorsement. *See Westport Bank & Trust Co. v. Geraghty*, 865 F.Supp. 83, 84 (D.Conn.1994). A corrected final judgment was entered in favor of the FDIC on June 15, 1995.

This appeal followed.

## Discussion

We disagree with the district court's rationale for decision in favor of the FDIC premised upon § 1828(k). The district court addressed only that section's definitional provision, § 1828(k)(4)(A), *see supra* note 3, in ruling that § 1828(k) compelled judgment for the FDIC. *See Westport Bank*, 865 F.Supp. at 85–86. Assuming *arguendo* that the payments contemplated by Appellants' trust agreements constituted "golden parachute payment[s]" within the meaning of § 1828(k)(4)(A), the question remains whether the operative provisions of § 1828(k) authorized the FDIC's disaffirmance of Appellants' employment and trust agreements.

Paragraph (1) of § 1828(k) certainly does not provide any such authority. The FDIC may proceed under that provision only after "prescrib[ing], by regulation, the factors to be considered by the [FDIC] in taking any action pursuant to paragraph (1)," § 1828(k)(2), *supra* note 3, and no such prescription had occurred when the FDIC disaffirmed Appellants' employment and trust agreements.

The FDIC contends that paragraph (3) of § 1828(k) would bar distribution of the trust funds to Appellants "[e]ven if this Court were to hold that the [FDIC] had no power to repudiate [Appellants'] employment and trust agreements." There are, however, significant difficulties with this position. Paragraph (3) prohibits only the "prepay[ment]" of "salary or any liability or legal expense of" Appellants. It is at least questionable whether the payments contemplated by the trust agreements are "salary" payments, and they are clearly designed to satisfy liabilities *to* Appellants under their employment agreements, rather than liabilities *of* Appellants.

▮ In any event, rather than venture a definitive resolution of this novel statutory issue, we elect to resolve this appeal on the

taking any action pursuant to paragraph (1)....

**(3) Certain payments prohibited**
No insured depository institution or depository institution holding company may prepay the salary or any liability or legal expense of any institution-affiliated party if such payment is made—
(A) in contemplation of the insolvency of such institution or holding company or after the commission of an act of insolvency; and
(B) with a view to, or has the result of—
(i) preventing the proper application of the assets of the institution to creditors; or
(ii) preferring one creditor over another.
**(4) "Golden parachute payment" defined**
For purposes of this subsection—
(A) In general
The term "golden parachute payment" means any payment (or any agreement to make any payment) in the nature of compensation by any insured depository institution or depository institution holding company for the benefit of any institution-affiliated party pursuant to an obligation of such institution or holding company that—

(i) is contingent on the termination of such party's affiliation with the institution or holding company; and—
(ii) is received on or after the date on which—
(I) the insured depository institution or depository institution holding company, or any insured depository institution subsidiary of such holding company, is insolvent;
(II) any conservator or receiver is appointed for such institution;
(III) the institution's appropriate Federal banking agency determines that the insured depository institution is in a troubled condition (as defined in the regulations prescribed pursuant to section 1831i(f) of this title);
(IV) the insured depository institution has been assigned a composite rating by the appropriate Federal banking agency or the [FDIC] of 4 or 5 under the Uniform Financial Institutions Rating System; or
(V) the insured depository institution is subject to a proceeding initiated by the [FDIC] to terminate or suspend deposit insurance for such institution.

basis of the primary issue addressed by the parties—the authority *vel non* of the FDIC to disaffirm the employment and trust agreements pursuant to § 1821(e)(1).[4] We may, of course, affirm the judgment of the district court "on any basis for which there is a record sufficient to permit conclusions of law, including grounds upon which the district court did not rely." *Cromwell Assocs. v. Oliver Cromwell Owners, Inc.*, 941 F.2d 107, 111 (2d Cir.1991).

■ Because the district court awarded summary judgment to the FDIC, our standard of review is *de novo, see MacKenzie*, 60 F.3d at 973, and we draw all factual inferences in favor of the nonmoving party, *see id.; Keywell Corp. v. Weinstein*, 33 F.3d 159, 163 (2d Cir.1994).

Appellants argue that § 1821(e)(1) cannot be applied to disaffirm the trusts at issue in this case because: (1) Citytrust had performed all of its obligations under the trust agreements, and no obligation remained for the FDIC to disaffirm or repudiate pursuant to § 1821(e)(1) and (2) the irrevocable quality of these trusts removed the trust assets from the receivership estate, thereby precluding the FDIC from exercising authority over the trust corpora or claiming that the trust agreements were "burdensome" to "the orderly administration of the institution's affairs" within the meaning of § 1821(e)(1).

In response, the FDIC contends primarily that Appellants' rights to termination benefits arise under their respective employment agreements, not under their trust agreements. It claims that these trusts merely secured severance payments provided for in the employment agreements; accordingly, when the FDIC disaffirmed the employment agreements, the trusts failed by their own terms, and the assets reverted to Citytrust's

successor, the FDIC. As the FDIC summarized in its brief: "Once the FDIC receiver repudiated the employment agreements, there were no underlying obligations for the trust funds to secure and the receiver was entitled to claim them for the benefit of Citytrust's depositors and creditors."

■ Section 1821(e)(1) states that "the conservator or receiver for any insured depository institution may disaffirm or repudiate any contract or lease" that it "determines to be burdensome" and "the disaffirmance or repudiation of which ... will promote the orderly administration of the institution's affairs." § 1821(e)(1), *supra* note 2. It is clear that Appellants' employment contracts fall within the term "any contract or lease." Both contracts extended until December 31, 1992 and were therefore executory contracts that could be disaffirmed by the FDIC upon an appropriate finding that they were burdensome. *See Resolution Trust Corp. v. Diamond*, 18 F.3d 111, 117–18 (2d Cir.) (§ 1821(e)(1) authorizes a receiver to "disaffirm or repudiate any burdensome executory contract or lease"), *vacated & remanded sub nom. Solomon v. Resolution Trust Corp.*, —— U.S. ——, 115 S.Ct. 43, 130 L.Ed.2d 5 (1994), *reinstated in relevant part sub nom. Resolution Trust Corp. v. Diamond*, 45 F.3d 665 (2d Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 2609, 132 L.Ed.2d 853 (1995); *see also Howell*, 986 F.2d at 571. However, Appellants do not seek recovery of severance payments from the FDIC under their respective employment agreements. Rather, this interpleader action is concerned with whether Steere and Geraghty are entitled to payment from trust funds set aside to secure Citytrust's severance obligations under Appellants' employment agreements. *See supra* note 4.

---

4. The Appellants very specifically assert in their main brief on appeal that "[t]he question presented is whether the FDIC had the authority to revoke the trusts." At oral argument, Appellants' counsel reiterated on several occasions that if Appellants were consigned to claim against the FDIC as general creditors, *see* § 1821(e)(7)(A), *supra* note 2, they would not recover anything. Accordingly, there is no occasion for us to consider whether, if the FDIC properly disaffirmed Appellants' employment and trust agreements pursuant to § 1821(e)(1),

*supra* note 2, Appellants might have claims for damages resulting from that repudiation pursuant to § 1821(e)(3), *supra* note 2. *See Howell v. FDIC*, 986 F.2d 569, 571 (1st Cir.1993) ("By repudiating the contract the receiver is freed from having to comply with the contract, but the repudiation is treated as a breach of contract that gives rise to an ordinary contract claim for damages, if any. Whether that claim is then 'allowed' by the receiver and if so whether there are assets to satisfy it, are distinct questions ....") (citation omitted).

We addressed a similar issue in *Mac-Kenzie*. In that case, the trustee of two trusts brought an interpleader action against the Resolution Trust Corporation (the "RTC"), acting in its capacity as receiver for Columbia Banking Federal Savings and Loan Association ("Columbia")[5], and two former executives of Columbia to determine the ownership of the trust assets. 60 F.3d at 973. The res of these trusts consisted of the assets of two deferred executive compensation plans created for the benefit of Columbia's executives. *Id.* at 974. The trust agreements explicitly subjected the trust assets to the claims of Columbia's creditors in the event of insolvency. *Id.* The issue presented in *MacKenzie* was whether "the RTC ha[s] a superior right to grantor trust assets where a grantee's claim to those assets was made prior to receivership." *Id.* at 976.

First, we stated that "[a]ssets held in a grantor trust are considered the property of the grantor" for federal tax purposes, *id.* at 976, and that "under the tax code, it is the act of distribution which conveys the assets held in a grantor trust from the grantor to the grantee," *id.* at 977; *see* I.R.C. §§ 671–79 (grantor trust tax provisions). Further, *MacKenzie* also recognized that the language in the grantor trust agreements and the executive compensation plan agreements explicitly subjected the trust assets to the claims of Columbia's creditors. *Id.* at 974, 977. In view of these facts, we held that "at all times relevant to this case the Plan assets remained the property of Columbia, subject to the claims of its creditors." *Id.* at 977.

*MacKenzie* is clearly dispositive with respect to Steere's rabbi trust, whose assets (like those of the trusts in *MacKenzie*) are explicitly subjected to the claims of general creditors in the event of the grantor's insolvency. Appellants assert, however, that *MacKenzie* is inapposite with respect to the two secular trusts, which expressly preclude Citytrust creditors from gaining access to the trust assets. As noted, *MacKenzie* did rely in part upon the availability of the trust assets to creditors in the event of insolvency for its ruling in favor of the RTC. By contrast, Appellants maintain that their grantor trusts completely and irrevocably transferred title from Citytrust to Westport, thereby depriving Citytrust of any claim to the assets.

■ We disagree. The two secular trusts are both described as grantor trusts, and the trustee of each is expressly authorized "to undertake or refrain from undertaking any actions ... in order to ensure that the Grantor is at all times treated as the owner of the Trust for federal income tax purposes." By virtue of this beneficial tax treatment, we noted in *MacKenzie* that " '[i]n reality, the recipient receives only the company's unsecured promise to pay benefits and has no rights against any assets other than the rights of a general unsecured creditor of the company.' " 60 F.3d at 977 (quoting *Mertens Law of Federal Income Taxation* § 25B.212 (1988)). The Fourth Circuit has stated in a similar context that "the beneficial tax treatment of a grantor trust [is conditioned upon] the requirement that the trust fund remains subject to the claims of the employer's creditors as if the assets were the general assets of the employer." *Goodman v. Resolution Trust Corp.*, 7 F.3d 1123, 1127 (4th Cir.1993).

Concededly, *Goodman*, like *MacKenzie*, involved a rabbi trust whose assets were expressly made subject to the claims of the grantor's creditors in the event of the grantor's insolvency. *See* 7 F.3d at 1126. We do not believe, however, that the recitals that the secular trusts in this case are irrevocable and are not subject to the claims of Citytrust's creditors are dispositive of this lawsuit. Despite these generalities, the trust instruments expressly provide that the grantors retain ownership of the trust assets, state a number of contingencies upon whose occurrence the assets of the trusts will be returned to Citytrust, and expressly provide that the trusts will terminate on "the date on which the Trust Beneficiary is no longer entitled to benefits hereunder," whereupon "[a]ny assets remaining in the Trust ... shall be returned to [Citytrust]."

Thus, we deem inapplicable authorities such as *Linahan v. Linahan*, 131 Conn. 307,

---

**5.** Subject to exceptions that are not pertinent here, FIRREA provides the RTC with the authority conferred by § 1821(e). *See* 12 U.S.C. § 1441a(b)(4)(A).

39 A.2d 895 (1944), cited to us by Appellants for the proposition that under Connecticut law, the creation of a trust requires vesting title in the trustee or transferring title to a third party "under such circumstances that the donor no longer has any dominion over the property." *Id.* at 318, 39 A.2d at 900. Wholly aside from the question whether § 1821(e) would authorize the FDIC to override the provisions of a trust that met the requirements of *Linahan, see Diamond,* 45 F.3d at 670–71 ("Section 1821(e)(1) is an express grant of federal power exercisable in derogation of all contrary state law, and it therefore supersedes—or preempts—volumes of state law."), trusts drawn to take advantage of the "owner" provisions of I.R.C. §§ 671–679 simply do not fall within the parameters of *Linahan.*

▮ Thus, the question ultimately posed in this case is whether the FDIC was entitled by § 1821(e)(1) to disaffirm or repudiate Appellants' employment agreements. As previously noted, we agree with *Diamond* that § 1821(e)(1) "expressly grants the [FDIC] the power to abrogate valid contracts and leases where the agency has determined that they are burdensome," 45 F.3d at 670, and perceive no reason why that authority could not be exercised with respect to Appellants' employment agreements.

The FDIC exercised this authority on August 21, 1991. Whatever view may be taken as to the date of the termination of Appellants' employment, it occurred no earlier than August 9, 1991. However, Appellants were not entitled to any distributions from the secular trusts unless a qualifying termination of employment occurred and the requisite payments were not made "in a lump sum within thirty (30) days of the effective date of such termination of employment." Thus, the conditions for payment from the secular trusts never matured because of the FDIC's intervening disaffirmance and repudiation (on August 21, 1991) of the employment agreements that the secular trusts were designed to secure, and the assets of the trusts became available to Citytrust in accordance with both the terms of the trusts and the principle that "[i]f the purposes for which a trust is created become impossible of accomplishment ..., the trust will be terminated." Restatement (Second) of Trusts § 335 (1959); *see also id.* § 411 ("Where ... the trust fails, the transferee holds the trust estate upon a resulting trust for the transferor or his estate.... ").

Appellants argue that by allowing the FDIC to disaffirm employment agreements as has occurred in this case, the FDIC's announced policy to encourage the recruitment of executives to rehabilitate depository institutions in troubled condition will be undermined. *See, e.g.,* Proposed FDIC Rules for the Regulation of Golden Parachutes and Other Benefits Which May Be Subject to Misuse, 60 Fed.Reg. 16,069, 16,072 (1995) ("In order to induce [a qualified] individual to leave an established, stable career for a job in a troubled institution which may not survive regardless of that individual's efforts, it is generally necessary to agree to pay that individual some sort of severance payment in the event that the efforts of the individual for the institution are not successful."). It is not our role, however, to determine whether the FDIC has exercised its authority wisely, or even with entire fairness, in this case, but rather whether it has done so within the parameters of the authority delegated to it by § 1821(e)(1). Almost inevitably, insolvency harshly affects a wide range of entities, including (in the case of insured depository institutions) the public fisc. The FDIC, not this court, has been accorded the primary responsibility for making the difficult choices that such circumstances entail. Its discharge of that responsibility in this case did not exceed the authority vested in the FDIC by § 1821(e)(1).

### Conclusion

The corrected final judgment of the district court is affirmed.